## Connecticut Mutual Life Insurance Co. *versus* Groom, Administrator.

A policy of insurance, which provides that it shall be void if the insured " shall die by suicide," is not forfeited by the insured destroying himself, he being insane at the time, but intending to take his life and knowing that death would result from his act.

January 15th 1878. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and TRUNKEY, JJ.

Error to the late District Court of *Philadelphia county :* Of January Term 1875, No. 141.

Covenant by Grace A. Boileau against the Connecticut Mutual Life Insurance Company, on a policy of life insurance. The plaintiff died after the trial, and E. J. Groom, her administrator, was substituted in her place upon the record. The plaintiff in her *narr.* averred that the defendant company, in consideration of an annual premium of $434.40, had insured the life of her husband, James M. Boileau, for the sum of $5000 ; that said James M. Boileau died on the 24th of May 1873 ; that satisfactory proof was duly made to said corporation of his death, and all the conditions required by the policy had been fulfilled ; yet, upon demand, the said company had refused to pay the said $5000, &c. The policy contained the following words : " or if he shall die by suicide or in violation of any law, * * * then in each and every of the foregoing cases this policy shall become and be null and void." The defendant filed a special plea, which set forth that the policy of insurance in question was issued by defendant and accepted by said party insured, upon the express condition that if said James M. Boileau should die by suicide, then the said policy should be void, and that on the 24th of May 1873, said Boileau did die by suicide, by drowning himself in the Neshaminy creek, in Bucks county, Pennsylvania.

The plaintiff replied that at and previous to the time when said James M. Boileau died he was insane ; that his death was not the result of his voluntary and intelligent act, and that he did not die by suicide, within the true intent and meaning of said policy.

At the trial, before Hare, P. J., the following question was reserved for the court in banc : " whether the policy in suit was

forfeited by the suicide of Boileau, he being insane at the time, but intending to take his life, knowing that death would result from what he did; judgment to be entered for the plaintiff in the sum of $5194.50, if the court are of opinion that such insanity does not avoid the forfeiture, otherwise for the defendant. This consent not to take effect unless the jury find that Boileau was insane."

It was not disputed that Boileau voluntarily threw himself into the creek, that the act was premeditated, and that he had a full knowledge of the result to which it would lead.

The court having reserved the foregoing question, as stated, charged, inter alia, as follows : " The defendants in this case contend that suicide is synonymous with self-destruction, and occurs whenever one designedly takes his life, although he has lost the power of self-control, or is unable to distinguish between right and wrong. If this be conceded, the insurance came to an end when Boileau threw himself into the water and was drowned, whether he was or was not in his right mind. It may be true that suicide is sometimes used in this sense, but such is not its general signification. In the legal acceptation of the term it is self-murder, the felonious taking of one's own life. It is a crime punishable with an ignominious burial and the forfeiture of the offender's goods : 4 Bl. Com. 189. Such is the definition given by Blackstone ; and if we turn to Johnson and Walker's dictionary, or to Webster's, we shall find that these authors give the legal meaning of the word as that in which it is commonly understood.

" It would be contrary to legal analogy that one who is not morally responsible for what he does should be visited with penal consequences ; accordingly, Blackstone says, the party must be in his senses and have arrived at years of discretion, or it is no crime.

" In this aspect of the case, Boileau's death by his own hands, during a paroxysm of insanity, would not invalidate the policy. If the meaning of the clause is doubtful, the decision should be in favor of the plaintiff. It is a general principle that where the terms of a contract admit of two interpretations, that should be adopted which will avoid a forfeiture or prevent a breach of condition. This is only just, because it is always in the power of the party who makes such a stipulation to use language which cannot be misunderstood. I am the more willing to adopt this view, because it will enable me to leave the question of fact to you, and reserve the law for the consideration of the court above."

The court then left the question, " Was Boileau insane ?" as one of fact to the jury, but with the qualification " that insanity, in the sense in which they were to consider it, must not be a mere disturbance of intellect, but such a complete change in the moral and mental condition of the patient as would put an end to his responsibility as a free and intelligent being. Unless the deceased was

[Connecticut Mutual Life Ins. Co. *v.* Groom.]

insane in this sense, his death by his own hand was "suicide," within the legal meaning of the term, and a forfeiture of the condition of the policy. It was for them to determine whether the painful ideas which had beset Boileau for many months, and which, agreeably to the evidence, were recurring with an ever-increasing force, at last so entirely overpowered his judgment as to render him unable to distinguish between right and wrong. If they found that he was not a responsible moral agent when he did the act which occasioned his death, they might find that it was not suicidal, under the terms of the contract in suit. If, on the other hand, they found, that although mortified by his inability to pay his creditors, apprehensive of the future, and suffering from painful thoughts which he could not repress, he was still able to discern that self-destruction was criminal, and might have resisted the impulse to which he succumbed, it would be their duty to render a verdict for the defendant, without regard to the pity which they might feel for Boileau, or the sympathy which must naturally exist in their breasts for his widow."

The jury rendered a verdict for the plaintiff for $5194.50. Subsequently, upon a motion on behalf of defendant for judgment on the reserved point, the court, Briggs and Mitchell, JJ., dissenting, refused the motion and entered judgment on the verdict, which was the error assigned by the company which took this writ.

*M. Arnold* and *W. S. Price*, for the plaintiff in error.—Upon the point reserved we contend the judgment should have been in favor of the company, as appears by the following cases: In Borradaile *v.* Hunter, 5 Man. & Gr. 639, the policy read, "if the assured should die by his own hand." In Clift *v.* Schwabe, 3 Man. Gr. & Scott 437, "should commit suicide." In Dean *v.* American Mutual Life Ins. Co., 4 Allen 96, "shall die by his own hand, or in consequence of a duel, or by the hands of justice." In Cooper *v.* Massachusetts Mutual Life Ins. Co., 102 Mass. 227, "should die by suicide." In Vanzandt *v.* Mutual Benefit Life Ins. Co., 10 Sickles 169, "should die by his own hands."

[SHARSWOOD, J.—Are "dying by his own hands" and "suicide" synonymous?]

The English cases so decide, and they were held to be synonymous, in Eastabrook *v.* Union Mutual Life Ins. Co., 54 Maine 224.

The Circuit Courts of the United States for the District of Connecticut, Woodruff and Shipman, JJ. (Gay *v.* Union Mutual Life Ins. Co., 9 Blatchford 142), and for the Western District of Pennsylvania, McKennan, J. (Nimick *v.* Mutual Benefit Life Ins. Co., 3 Brewster 502), have instructed juries in accordance with the English, New York and Massachusetts rule. The decision of the Supreme Court of the United States, in Mutual Life Ins. Co. *v.* Terry,

15 Wall. 580, stands alone on this question, opposed to the courts of England and all the states.

*George R. Snowden*, for defendant in error.—In the case at bar, the statement that the insured knew that throwing himself into deep water would produce death, does not alter the main fact, submitted to and found by the jury, that he was insane at the time, and, therefore, had no moral and intellectual capacity ; it was his physical act, but not his voluntary, intelligent act. We contend that self-destruction by an insane man is not an act of suicide within the meaning of the law. Suicide is a felonious homicide : 4 Sharswood's Blackstone 188.

In the case of the Mutual Life Insurance Co. of New York *v.* Terry, 15 Wall. 580, the precise question which is involved in the case at bar, is decided in favor of the insured. In that case the policy contained the condition : "If the said person whose life is insured * * * shall die by his own hand * * * this policy shall be null and void." The insurance was on the life of George Terry, made for the benefit of his wife. The husband died from the effects of poison taken by him. Evidence was given tending to show that at the time he took the poison he was insane. Evidence was also given to show that he was sane, and capable of knowing the consequences of the act he was about to commit. The court there said : "If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable." The decisions of the Supreme Court of the United States should be followed in cases of this character by the courts of the several states. The corporation defendant is created by the laws of Connecticut, and has a chief office in that state, while it has subordinate offices in many of the states of the Union. The same company should not have different responsibilities and liabilities in different states. In the case at bar, the suit might have been brought in the United States courts, which would have been bound to follow the rulings in Terry *v.* Insurance Co., *supra.* The law, as held in .Terry *v.* Insurance Co., was also ruled in Eastabrook *v.* Insurance Co., 54 Maine 224 ; and American Life Insurance Co. *v.* Isett's Admr., 24 P. F. Smith 176, substantially holds to a similar principle. A point in the case was : "If F. P. Isett, at the time of his death, was conscious that his death would follow the discharging of the pistol in his own hands, there can be no recovery, although he was laboring under mental depression or disturbance of the mind." · The court below negatived the point.

.[Connecticut Mutual Life Ins. Co. *v.* Groom.]

Held not to be error. Insanity is a disease, and the risk against death by suicide is provided against in the insurance tables of mortality. Death, then, by an insane suicide, is death by disease: Eastabrook *v.* Ins. Co., *supra.*

Mr. Justice WOODWARD delivered the opinion of the court, May 8th 1878.

By the facts agreed upon at the trial, and by the verdict, it was established that James M. Boileau's death was caused by his own act; that he was insane at the time; that he intended to take his life; and that he knew death would result from the act he committed. The suit was upon a policy of insurance on Mr. Boileau's life, and contained a provision that if he should " die by suicide" it should be null and void. The effect of that provision on the rights of the plaintiff, in view of the established fact of the insanity, has been the point especially in controversy. On the one hand, the ground was taken that the word suicide cannot properly be applied to a voluntary death, unless caused by an act done by a person of sound mind, and capable of measuring his moral responsibility for his conduct. On the part of the defendants, it was contended that the word is synonymous with death by one's own hand, simply signifying the killing of one's own self, and that whether he is sane or insane when he kills himself, depends on his knowledge or ignorance of the consequences of the act. The jury were instructed that the clause of forfeiture in the policy would not bar a recovery if they should find Mr. Boileau to have been insane, and that insanity would be made out if they should find that his anxieties and sufferings had " so entirely overpowered his judgment as to render him unable to distinguish between right and wrong."

Undoubtedly the weight of authority—or rather the preponderance of decisions—in England and this country, has been in support of the legal theory of the counsel for the defendants. But it is believed that the class of cases to which the Mutual Life Insurance Company of New York *v.* Terry, 15 Wall. 580, belongs, furnish the safer and better rule. The clause of the policy relied on was not a covenant for the performance of a duty under a mutual contract. It was scarcely a condition even. It was a provision for the absolute forfeiture of the rights of the insured on the happening of the specified contingency. Premiums were paid from the 14th of February 1872, until the death occurred. To serve the purposes of the defendants, it was requisite that the existence of conditions under which the clause of forfeiture was to have operation, should be clearly, strictly and technically made out. He who receives an instrument, and parts with his money on the faith of it, should have a construction put upon it in his favor, because the words of the instrument are not his, but those of the other party: Mayer *v.* Isaac, 6. M. & W. 612. This principle applies

to a condition in a policy of insurance, which, being the language of the company, must, if there be any ambiguity in it, be, taken most strongly against them: Notman *v.* Anchor Ass. Co., 4 C. B. N. S. 481. Generally, in legal acceptation and in popular use, the word suicide is employed to characterize the crime of self-murder. It is called "self-murder" in terms in Webster, and is defined to be "the act of designedly destroying one's own life, committed by a person of years of discretion and of sound mind." Self-destruction, under insane impulses so strong as to be beyond the control and restraint of the will, is a result produced by disease, for which the victim of it is no more morally responsible than he would be for any other of the maladies of which men die. The disease, when it manifests itself in that form of melancholia, which creates a prevailing propensity to suicide, consists in the unfounded and morbid fancies of the sufferer regarding his means of subsistence or his position in life, or in distorted conceptions of his relations to society or his family, of his rights or duties, or of dangers threatening his person, property or reputation. "When the melancholic hallucination has fully taken possession of the mind," says Abercrombie, "it becomes the sole object of attention, without the power of varying the impression or of directing the thoughts to any facts or considerations calculated to remove or palliate it. The evil seems overwhelming and irremediable, admitting neither of consolation nor hope. For the process of mind calculated to diminish such an impression, or even to produce the hope of a palliation of the evil, is precisely that exercise of mind which, in this singular condition, is lost or suspended, namely, the power of changing the subject of thought, of transferring the attention to other facts or considerations, and of comparing the mental condition with these, and with the actual state of things. Under such a conviction of overwhelming and hopeless misery, the feeling naturally arises of life being a burden, and this is succeeded by a determination to quit it. When such an association has once been formed it also fixes itself upon the mind, and fails to be corrected by those considerations which ought to remove it." Whart. & Stille's Med. Jur., § 206. When the disease attains a stage at which the mental power to judge of the moral nature of the act is entirely gone, self-destruction does not become suicide in the sense of self-murder. Such an act has never involved criminal responsibility and punishment, and it should not be followed, except under express stipulation, by a forfeiture of contract rights. The rule adopted by Willard, J., in Breasted *v.* Farmers' Loan Co., 2 Am. Law Reg. 358, was a safe and just one. "It must occur to every prudent man seeking to make provision for his family by an insurance on his life, that insanity is one of the diseases that may terminate his being. It is said the defendants did not insure the continuance of the intestate's reason. Nor did they, in terms, insure

[Connecticut Mutual Life Ins. Co. *v.* Groom.]

him against small-pox or scarlet fever; but had he died of either disease, there is no doubt that the defendants would have been liable. They insured the continuance of his life. What difference can it make to them or to him whether it is terminated by the ordinary course of disease in his bed, or, in a fit of delirium, he ends it himself. In each case the death is occasioned by a means within the meaning of the policy, if the exception contemplates, as I think it does, the destruction of life by a rational agent, responsible for his act."

But it has been urged that the steps taken by Mr. Boileau to destroy his life were consciously intelligent, and that he knew what the consequence of taking them would be. There is no doubt that he had such knowledge. His very purpose was to kill himself. Such a degree of intelligence may well co-exist with faculties so distorted and a mind so shattered by long-continued suffering as to inspire a morbid impulse, the nature of which the weakened judgment cannot measure, and the execution of which the uncertain and feeble will cannot restrain. Almost every insane man knows that food will satisfy hunger, and that water will quench thirst. He is able to realize that fire will burn him; that blood will follow the blow of a knife, and that he will feel pain if his flesh is torn. And he acts consciously throughout his life on such knowledge. It survives often among the instincts of the man after the intellect is wrecked. But the effect of partial mental aberration is concentrated upon the faculties involved in the disease. In McElroy's case, 6 W. & S. 451, Judge Huston said that all treatises on insanity and most reports of trials relating to insane persons, show that a total loss of reason and memory is unknown to courts and physicians, unless in cases of delirium from disease, or absolute frenzy; and yet commissions of lunacy are constantly found, and deeds and wills avoided for insanity. In the opinion the judge quoted, the remark of Lord Hale, that "some persons that have a competent use of reason in respect to some subjects, are under a particular dementia in respect to some particular discourses, subjects, or applications." He quoted also from the argument of Mr. Erskine in defence of Hatfield, the statement which was adopted in the judgment of the court, that "in all the cases which have filled Westminster Hall with the most complicated considerations, the lunatics and other insane persons who have been the subjects of them, have not only had the most perfect knowledge and recollection of all the relations they stood in towards others, and of the acts and circumstances of their lives, but have in general been remarkable for subtlety and acuteness. Defects in their reasonings have seldom been traceable. The disease consisted in the delusive sources of thought; all their deductions within the scope of the malady being founded on the *immovable assumption* of matters as realities,

[Connecticut Mutual Life Ins. Co. *v.* Groom.]

either without any foundation whatever, or so distorted and disfigured by fancy as to be nearly the same thing as their creation.''

In every respect this cause was determined accurately in the court below. The charge was subject to no valid objection, and the judgment was properly entered for the plaintiff on the point reserved.

Judgment affirmed.