McCUE et al. v. NORTHWESTERN MUT. LIFE INS. CO. et al.

(Circuit Court of Appeals, Fourth Circuit. November 5, 1908.)

No. 739.

1. INSURANCE (§ 438*)—LIFE INSURANCE—RISKS INSURED AGAINST—EXECUTION OF INSURED FOR CRIME.

The fact that an insured was legally executed for crime will not defeat recovery on a life policy on the ground that death by such means was not one of the risks insured against, where the policy was in a mutual company of which all policy holders became members and which was authorized by its charter "to make all and every insurance appertaining to or connected with life risks," the policy contained no exception of such risk, and the general state agent of the company accepted payment of a premium from the insured after he had committed the crime for which he was afterward executed and while he was in prison awaiting trial.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 438.*]

2. COURTS (§ 359*)—FEDERAL COURTS—STATE LAWS AS RULES OF DECISION—PUBLIC POLICY OF STATE.

Where the public policy of a state has been declared either by statute or by uniform decision, it will be recognized and followed by the federal courts as to contracts or other matters governed by the laws of such state, although it is contrary to what has been independently determined and announced by such courts as the true public policy.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 359.*

State laws as rules of decisions in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71: Hill v. Hite, 29 C. C. A. 553.]

3. INSURANCE (§ 147*)—LIFE INSURANCE—CONSTRUCTION OF CONTRACT—LAW GOVERNING.

A policy of life insurance issued by a mutual company incorporated by a special act of the Legislature of Wisconsin which defines its powers and obligations and makes all policy holders, their heirs and assigns, members so long as they remain insured, with the right to vote and share in dividends earned, which policy shows on its face that it was issued at the office of the company in Wisconsin and is payable there, is a Wisconsin contract, and the rights of the parties are governed by its laws.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 293; Dec. Dig. § 147.*]

4. INSURANCE (§ 438*)—LIFE INSURANCE—RISKS INSURED AGAINST—EXECUTION OF INSURED FOR CRIME.

A policy of life insurance was issued by a Wisconsin corporation authorized by its special charter to "make all and every insurance appertaining to or connected with life risks" without limitation. The policy

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was a Wisconsin contract, construable and enforceable under its laws. By the rule of public policy established by the decisions of the state Supreme Court the manner of death of an insured does not avoid the policy where third persons are beneficiaries, in the absence of any provision in the policy to that effect. *Held*, that the fact that the insured was executed for a crime did not bar a recovery on the policy by his heirs, where it contained no provision excluding such risk.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 438.*]

Waddill, District Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Virginia, at Lynchburg.

On March 15, 1904, the Northwestern Mutual Life Insurance Company issued to James McCue, of Charlottesville, a 10-year renewal life policy for $15,000, based upon an application made by him therefor on February 25th preceding. The policy provided that in event of death payment would be made to such beneficiary or beneficiaries as might thereafter be nominated, provided that, if no beneficiary survived the insured, then the payment should be made to his executors, administrators, or assigns. The application designated "my estate" as the person for whose benefit the insurance was desired. The policy provided that no liability should arise on the part of the company until the first premium should be actually paid. By arrangement made by McCue with Carroll and Fitzgerald, local agents soliciting the insurance, instead of actually paying the first premium he executed to them his note for $427.50, payable in 6 months, which sum was to cover premiums for 18 months from the date of the policy, or until September 15, 1905. Carroll and Fitzgerald sent this note with one of their own as collateral to Cary, the company's state agent, who remitted the $427.50 in cash to the company in due course of business. On September 7th following, eight days before this note of his became due, McCue was arrested and lodged in jail charged with the murder of his wife. While so in jail under such charge, on September 15th, when said note became due, he paid it to Cary, the company's state agent. He was subsequently tried and convicted upon the murder charge, and on February 10, 1905, was executed.

This suit was brought by foreign attachment in equity by the infant heirs at law against the company, the People's National Bank of Charlottesville, as garnishee, and the executors of said decedent. Subsequently, by stipulation of counsel, the facts were agreed, all questions as to whether the cause should be considered a law or equitable one, as to the right to trial by jury, or as to whether parties were misjoined, were waived, and the whole matter was submitted to the court, who found for the defendant, and thereupon both writ of error and appeal was taken to this court. Here the sole assignment of error relied on is that "the court erred in its verdict and judgment under the law and the facts in the case." It is admitted that the defendant insurance company is a strictly mutual one, incorporated by special act of the Legislature of Wisconsin; that its charter gave it "the power to insure the lives of its respective members, and to make all and every insurance appertaining to or connected with life risks, and to grant and purchase annuities." Membership in the company was to be effected by taking out insurance, and "persons who shall hereafter insure with the said corporation, and also their heirs, executors, administrators and assigns, continuing to be insured in said corporation as hereinafter provided, shall thereby become members thereof during the period they shall remain insured by such corporation and no longer." Trustees and officers of the company are required to be selected from such membership. Dividends are required to be distributed to such membership from the profits secured by the company.

Daniel Harmon and G. B. Sinclair (Harmon & Walsh and Walker & Sinclair, on the brief), for plaintiffs in error.

Wm. H. White and Wm. H. White, Jr., for defendants in error.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

Before PRITCHARD, Circuit Judge, and WADDILL and DAYTON, District Judges.

DAYTON, District Judge (after stating the facts as above). We cannot refrain from expressing our admiration for the learning, research, and ability displayed by counsel on both sides, in both oral arguments and in the briefs filed by them. It is not our purpose to discuss in detail all the points raised. To do so would consume too much time and space. On behalf of the defendant company it is insisted that "there can be no recovery on a life insurance policy where the insured is legally executed, the policy being silent on the subject." First. Because death on the gallows was not one of the risks against which decedent was insured. Second. Even if it had been a risk specially contracted for, a recovery under such circumstances would be contrary to public policy. On the other hand, it is contended: First. That this company, incorporated by special statute of Wisconsin, was expressly given the right "to insure the lives of its respective members and to make all and every insurance appertaining to or connected with life risks," and, having this power, admitted McCue into membership, thereby giving him a vested interest in the corporation, and bound itself to pay the policy "upon receipt and approval of proofs of the fact and cause of his death," without any condition against such death occurring by the mandate of the law. Second. That the obligation of this contract is controlled by the law of Wisconsin, that public policy affecting ordinary business transactions between citizens is determined by state laws, and the special statute of that state has settled the question of public policy adverse to the general rule relied on by the company. Third. That, if this were not so, the peculiar facts and conditions arising in this case take it outside of the application of this rule of public policy. In reply, it is insisted that this insurance policy in this court must be construed under the rules of general commercial law, and not under local state statutes.

We need have little trouble in disposing of the first ground of defense, to the effect that death by the mandate of the law was not one of the risks insured against by decedent's policy. It is well understood that the insurance companies generally have adopted a policy of incorporating into their policies exceptions to risks not desired to be undertaken by them. For instance, in this policy in controversy the company required McCue to agree that if he should "pass south of the Tropic of Cancer, or be previously engaged in blasting, mining, or submarine operations, or in the production of highly inflammable or explosive substances, or in electrical employment where the voltage is over six hundred, or in switching or coupling or uncoupling cars, or be employed in any capacity on the trains of a railroad, except as passenger or sleeping car conductor, mail agent, express messenger or baggage-master, or in ocean navigation, or shall enter or be engaged in any military or naval service (except in time of peace) without the written consent of said company, or shall within one year from the date of said policy, whether sane or insane, die by my (his) own hand," then the policy should be null and void. When it is remembered that this company was expressly authorized by its charter to "insure the

lives of its respective members and to make all and every insurance appertaining to or connected with life risks"; that no exception for death by mandate of the law was incorporated among these many other exceptions; that the company's general state agent allowed the decedent, after commission of the crime and when in custody to answer therefor, to pay the note executed by him for the 18 months' premium due—we are not prepared to hold that this risk was not one contemplated by the company when it executed this contract.

The case therefore resolves itself, in practical effect, to a solution of the question whether the contract, by reason of the manner of the death, was made absolutely void through considerations of public policy. And here we are involved in very great doubt and perplexity by reason of the conflict that exists in the decisions of many of the state courts themselves, and between those of many of these state courts and of the federal courts as to what constitutes the public policy touching cases of this kind and others involving similar principles.

Counsel for the company. in support of their position confidently rely upon these four cases: Amicable Society v. Boland, 4 Bligh (N. S.) 194; Burt v. Union Central Ins. Co., 187 U. S. 362, 23 Sup. Ct. 139, 47 L. Ed. 216; Ritter v. Mutual Life Ins. Co., 169 U. S. 139, 18 Sup. Ct. 300, 42 L. Ed. 693; Collins v. Met. Life Ins. Co., 27 Pa. Super. Ct. 353.

The Boland Case was decided by the House of Lords in England in 1830. There, Fauntleroy, insured, was guilty of forgery, then a capital offense, declared bankrupt, and his insurance policy with other effects was assigned to Boland and others as trustees. He was tried upon the forgery charge, convicted, and hung. His assignees sought to recover upon his insurance policy. The lower court gave judgment, but the House of Lords reversed it, and held that to allow recovery would be against public policy. It is insisted by counsel for appellants that this decision was determined largely by reason of the law of attainder then in force in England, but that since the abolition of this law with its attendant forfeiture of goods and corruption of blood, by 33 Victoria, in 1870, the principle of public policy set forth in this Boland Case has been greatly modified, if not reversed, by the Maybrick Case (Cleaver v. Mutual, etc., Life Association, 1 Q. B. D. 147), where it was held that although Mrs. Maybrick, who had poisoned her husband and been convicted, could not directly take the proceeds of her wrong, yet if, by a reasonable construction of the contract resulting in the avoidance of forfeiture, even if such construction resulted in establishing a trust fund for the benefit, in part, of Mrs. Maybrick, yet this could furnish no defense to the insurance company. In this case the Master of Rolls, all the other judges concurring, says:

"When people vouched that rule (of public policy) to excuse themselves from the performance of a contract in respect to which they had received the full consideration, and when all that remains to be done under the contract is for them to pay money, the application of the rule ought to be narrowly watched, and ought not to be carried a step further than the protection of the public requires."

Again, in Moore v. Woolsey, 4 E. & B. Q. B. 243 (82 E. C. L.), where the policy itself stipulated death by dueling, by suicide, or by

the hands of justice should be void as to the executors or administrators of the decedent, and remain in force only to the extent of any previous interest which may have been acquired by any other person under an actual assignment by deed, for a valuable consideration, etc., and when decedent was a suicide, Lord Campbell, C. J., says:

"Where a man insures his own life, we can discover no illegality in a stipulation that if the policy should afterwards be assigned bona fide for a valuable consideration, or a lien upon it should afterwards be acquired bona fide for a valuable consideration, it might be enforced for the benefit of others, whatever may be the means by which death is occasioned. No authority has been cited in support of the position that such a condition is illegal; and the frequent introduction of it into life policies indicates the general opinion that it is unobjectionable. The supposed inducement to commit suicide under such circumstances cannot vitiate the condition more than the inducement which the lessor may be supposed to have to commit murder should render invalid a beneficial lease granted for lives. When we are called upon to nullify a contract on the ground of public policy, we must take care that we do not lay down a rule which may interfere with the innocent and useful transactions of mankind. That the condition under discussion may promote evil by leading to suicide is a very remote and improbable contingency; and it may frequently be very beneficial by rendering a life policy a safe security in the hands of an assignee."

Whether or not the law of attainder had a controlling influence in the determination of the Boland Case is immaterial, for certain it is it should have no influence here, as we in this country have never recognized this law, and its operation has been expressly prohibited by our national Constitution and by those of most of the states, and by an act (Act April 10, 1790, c. 9, § 24, 1 Stat. 117) of Congress.

Turning now to the decisions of our state courts, we find:

(a) By the great majority of the state decisions it has been held that suicide is not excepted from the risks assumed by the insurer, unless the policy was taken out with intention to commit suicide and defraud the insurer. Patterson v. Ins. Co., 100 Wis. 118, 75 N. W. 980, 42 L. R. A. 253, 69 Am. St. Rep. 899; Supreme Conclave, etc., v. Miles, 92 Md. 613, 48 Atl. 845, 84 Am. St. Rep. 528; Eastabrook v. Ins. Co., 54 Me. 224, 89 Am. Dec. 743; Grand Lodge, etc., v. Wieting, 168 Ill. 408, 48 N. E. 59, 61 Am. St. Rep. 123; Kerr v. Association, 39 Minn. 174, 39 N. W. 312, 12 Am. St. Rep. 631; Schultz v. Ins. Co., 40 Ohio St. 217, 48 Am. Rep. 676; John Hancock Co. v. Moore, 34 Mich. 46; Conn. Mut. Life Ins. Co. v. Groom, 86 Pa. 92, 27 Am. Rep. 689; Darrow v. Society, 116 N. Y. 537, 22 N. E. 1093, 6 L. R. A. 495, 15 Am. St. Rep. 430. If this be true, then it necessarily follows that, if McCue in this case, after killing his wife, actuated by the remorse and terror that follows such a deed, had taken his own life, then there could be no question but what, under these decisions, his infant children could derive the benefit of this insurance; and the application of the doctrine of public policy in this case must be enforceable only because he did not go a step farther and commit th two crimes of murder, and self-destruction instead of the one alone.

(b) It has been held that for the beneficiary in an insurance policy to feloniously kill the insured in order to reap the benefit of such insurance will clearly defeat the contract so far as he or any one holding through him is concerned, upon the clearest principle of public policy.

But on the other hand, it has been held in the Maybrick Case, as we have shown, that if the proceeds of the policy go not direct to the guilty beneficiary, but to a trust fund constituted, in part, for his benefit, then public policy will not intervene and defend the insurer from the enforcement of his contract.

(c) "Statutes of descent have generally been held not to exclude an heir or devisee from the benefits of these statutes on the ground that the heir or devisee had feloniously and intentionally destroyed the life of the person from whom the legacy or inheritance was expected." Collins v. Life Ins. Co., 232 Ill. 37, 83 N. E. 542, 14 L. R. A. (N. S.) 356, 122 Am. St. Rep. 54; Shellenberger v. Ransom, 41 Neb. 641, 59 N. W. 935, 25 L. R. A. 564; Owens v. Owens, 100 N. C. 240, 6 S. E. 794; Carpenter's Estate, 170 Pa. 203, 32 Atl. 637, 29 L. R. A. 145; 50 Am. St. Rep. 765. From this principle it is clear that, if these infant children of McCue had killed their father instead of his killing their mother and getting hanged for it, thereby leaving them innocently without the support of either, then this policy made payable to his personal representatives could have been collected and made to inure to their benefit.

(d) It goes without saying that under constitutional and statutory prohibition no vested property rights of one dying at the hands of justice can be forfeited, no matter how heinous his crime, nor, for that reason, can the obligations of those who by ordinary contracts have dealt with him be avoided.

Therefore, if this insurance company had been a joint-stock company instead of a mutual one, and had contracted with McCue, for a valuable consideration, to deliver over to his personal representatives, say, $5,000 of its capital stock, the day after his death, no one would deny that it would have to comply with its contract.

But with great force it is argued that the question is no longer an open one in the federal courts, and that, notwithstanding the decisions of courts of last resort in the states to the contrary, the Supreme Court of the United States in Ritter v. Mutual Life Ins. Co., 169 U. S. 139, 18 Sup. Ct. 300, 42 L. Ed. 693, has held that a life insurance policy taken out by the insured for the benefit of his estate was avoided when he, in sound mind, intentionally took his own life, and this irrespective of the question whether there was a stipulation in the policy to that effect or not, and that the same court in Burt v. Union Central Ins. Co., 187 U. S. 362, 23 Sup. Ct. 139, 47 L. Ed. 216, has decided the exact question in controversy here to the effect that a policy of life insurance does not insure against the legal execution of the insured for crime. Touching the first case little need be said, and it is cited only as illustrating how jealously this great court has adhered to and applied this doctrine of public policy to these insurance contracts. That its ruling is not in accord with those of the courts of last resort in many of the states we have already pointed out, and in some of these states the contrary view has so impressed the legislative mind that special statutes, expressly nullifying the principle of this decision, have been enacted. In passing upon such a statute the Supreme Court, speaking through the same learned justice who rendered the opinion in the Ritter Case, says:

"That the statute is a legitimate exertion of power by the state cannot be successfully disputed. Indeed, the contrary is not asserted in this case, although it is suggested that the statute 'seemingly encourages suicide, and offers a bounty therefor, payable, not out of the public funds of the state, but out of the funds of insurance companies.' There is some foundation for this suggestion in a former decision of this court, in which it was held that public policy, even in the absence of prohibitory statute, forbade a recovery upon a life policy, silent as to suicide, where the insured, when in sound mind, willfully and deliberately took his own life. Ritter v. Mutual L. Ins. Co., 169 U. S. 139, 18 Sup. Ct. 300, 42 L. Ed. 693.

"But the determination of the present case depends upon other considerations than those involved in the Ritter Case. An insurance company is not bound to make a contract which is attended by the results indicated by the statute in question. If it does business at all in the state, it must do so subject to such valid regulations as the state may choose to adopt. Even if the statute in question could be fairly regarded by the court as inconsistent with public policy or sound morality, it cannot, for that reason alone, be disregarded; for it is the province of the state, by its Legislature, to adopt such a policy as it deems best, provided it does not, in so doing, come into conflict with the Constitution of the state or the Constitution of the United States." Whitfield v Ætna Life Ins. Co., 205 U. S. 489, 27 Sup. Ct. 578, 51 L. Ed. 895.

By this decision it seems to us we reach bed rock in this matter. It would seem very clear that touching general contracts of insurance, governed by the rules of commercial law, the federal courts in obedience to the ruling in the Ritter Case must hold, regardless of state decisions, that no recovery can be had on a policy of insurance on the life of one who willfully and deliberately, while in sound mind, took his own life. And we must go a step further and say that, in the case of such contracts general in character and governed by the rules of commercial law, we must, regardless of state decisions, in view of the decision of the Supreme Court in the Burt Case, hold that a policy of life insurance "does not insure against the legal execution of the insured for crime." But in special contracts not governed by the rules of commercial law, but provided for by special legislation of a state, conferring special rights and vested interests enforceable alone under such state legislation, we must, under the ruling in the Whitfield Case, be governed by the law of that state touching the application of this doctrine of public policy, for, under such circumstances, the state has a right to adopt the view entertained by the Supreme Court or to reject it. In other words, the state by its own legislation and the decisions of its own courts can establish its own public policy, "provided it does not, in doing so, come into conflict with the Constitution of the state or the Constitution of the United States," although such policy, so established, may be, in the opinion of the federal courts, "inconsistent with public policy or sound morality."

"The courts of the United States adopt and follow the decisions of the highest court of a state in questions which concern merely the Constitution or laws of that state; also where a course of those decisions, whether founded on statutes or not, have become rules of property within the state; also in regard to rules of evidence in actions at law; and also in reference to the common law of the state, and its laws and customs of a local character, when established by repeated decisions." Bucher v. Cheshire R. R. Co., 125 U. S. 555, 8 Sup. Ct. 974, 31 L. Ed. 795.

That this position has from the beginning, and uniformly since, been held by the Supreme Court, cannot be more strikingly illustrated than by its decisions touching indefinite charitable bequests and devises. In 1819, Chief Justice Marshall rendered his opinion in Baptist Association v. Hart, 4 Wheat. 1, 4 L. Ed. 499, in which he held such could not be established by a court of equity, independent of the statute, 43 Eliz. The case came from Virginia, where the public sentiment was distinct and very bitter against these indefinite charities, especially to church organizations. Judge Story subsequently published a concurring opinion in this case. 3 Pet. 481, 497, 7 L. Ed. 749. Subsequently he changed his mind and wrote the opinion in Vidal v. Girard's Ex'r, 2 How. 127, 11 L. Ed. 205, upholding such a bequest. See, also, Fontain v. Ravenel, 17 How. 369, 15 L. Ed. 80. The Virginia public policy, however, became firmly established in accord with the ruling in Association v. Hart against the validity of such indefinite charities. See Gallego's Ex'rs v. Attorney General, 3 Leigh (Va.) 450. In consequence, in Wheeler v. Smith, 9 How. 55, 13 L. Ed. 44, 24 Am. Dec. 650, and again in Kain v. Gibboney, 101 U. S. 362, 25 L. Ed. 813, both Virginia cases, the case of Association v. Hart was followed, and such indefinite charitable bequests were held void, solely because the rule of public policy in Virginia, as determined by the decisions of its courts, demanded it, and this, too, notwithstanding the fact that it was clear that Chief•Justice Marshall had been mistaken in saying that such charities in England could not be established by a court of equity independent of the statute of 43 Eliz., and the further fact that the Supreme Court in the Girard Case, and in other cases arising from other states where no such rule of public policy prevailed, had upheld such charities. In fact, in Russell v. Allen, 107 U. S. 167, 2 Sup. Ct. 331, 27 L. Ed. 397, Mr. Justice Gray says:

"And the only cases in which this court has followed the decision in Baptist Association v. Hart have, like it, arisen in the state of Virginia, by the decisions of whose higher court charities, except in certain cases specified by statute, are not upheld to any greater extent than other trusts."

It would seem clear, therefore, that the Supreme Court by this line of decisions, so uniformly upheld for so many years, notwithstanding we be in entire accord with it as to what constitutes the true principle of public policy based upon sound morals in the premises, has directed us if the state has, by its statutes or the decisions of its highest court, established a contrary rule not contrary to constitutional inhibition, to follow such rule in the enforcement of contracts arising under the laws of that state and not otherwise.

It therefore becomes important for us to determine, first, whether this insurance policy was a Wisconsin contract or simply a commercial one, and, second, whether the rule of public policy in Wisconsin, if there be any, is contrary to that enunciated by the Supreme Court.

As to the first: The defendant company is a Wisconsin corporation. It owes its life to a special act of the Legislature of that state (Priv. Laws Wis. 1857, p. 195, c. 129), which distinctly defines its power and obligations. This act, amended by some nine other legislative acts, enacted from time to time since 1857, expressly provides

that those "who shall hereafter insure with the said corporation, and also their heirs, executors, administrators and assigns * * * shall thereby become members thereof during the period they shall remain insured." It gives to them, under conditions expressly set forth, the right to vote for and elect its trustees and officers; to become such trustees and officers; to sue said corporation and to be sued by it touching their rights and obligations as such members; and it goes to the extent of expressly defining the rule of evidence as to disqualification of witnesses in any such suits; it provides for stated dividends to be ascertained and paid to them from the profits of the company, and other provisions are made, all of which clearly disclose that persons holding these policies become members of the corporation and acquire rights under and by virtue of these laws not set forth in the policy and not attaching to the ordinary policies issued by stock companies. In addition to this, the policy on its face shows it was executed at the office of the company in Wisconsin, and by its express terms was made payable there. This being true, the conclusion is inevitable: This contract must be held to be a Wisconsin one, to be construed according to its laws.

As to the second question: The legislative act of Wisconsin gave to this company the unlimited power to "insure the lives of its respective members and to make all and every insurance appertaining to or connected with life risks."

"This court can know nothing of public policy except from the Constitution and the laws and the course of administration and decision. It has no legislative powers. It cannot amend or modify any legislative acts. It cannot examine questions as expedient or inexpedient, as politic or impolitic. Considerations of that sort must, in general, be addressed to the Legislature. Questions of policy determined there are concluded here." License Tax Cases, 5 Wall. 462, 469, 18 L. Ed. 675.

This legislative act did not limit the power to assume life risks, but expressly gave power to assume all and every such. We would simply be indulging in judicial legislation for the state of Wisconsin if we should add to this act "except those arising from suicide or hanging." To have clothed this company with this power may have been inexpedient and unwise, but with that we can have no concern. Having been thus empowered to assume all and every risk, the company was not thereby deprived of the power to limit its assumption by express stipulations in the contract to those it was willing and desirous to assume. If it does not, however, so limit its liability under such circumstances, it must be held to have assumed the risks, under ruling of the Supreme Court of Wisconsin in McCoy v. Northwestern Mutual Relief Association, 92 Wis. 577, 66 N. W. 697, 47 L. R. A. 681. In this case the policy provided that death by suicide was not one of the risks assumed, and would render the policy void. The charter and by-laws of the company did not exclude suicide as a risk, however. The lower court held that, by reason of the charter not so excluding death by suicide as a risk to be assumed, the suicide clause in the policy was void, and the company responsible notwithstanding. The Supreme Court reversed this ruling, and held that the policy contract could

provide such exception, although the charter and by-laws of the company did not. Marshall, J., in this case, says:

"It is well settled that, if a contract for life insurance does not provide against liability in case of death by suicide or self-destruction, then such cause of death does not constitute a defense."

Again in Patterson v. National, etc., Ins. Co., 100 Wis. 118, 75 N. W. 980, 42 L. R. A. 253, 69 Am. St. Rep. 899, the Supreme Court of Wisconsin, after direct consideration of the Boland Case (upon which the ruling in the Burt Case is based) and the Ritter Case, says:

"Conceding the strength of the arguments upon public policy on which the Ritter Case is based, we still think, in view of the prior decisions above cited to the contrary of the rule there laid down, and the general apparent acquiescence in these decisions by the courts and by the people, that we ought to hold, in accordance with those decisions, that, in case where third persons are beneficiaries, intentional suicide of the insured while sane does not avoid the policy, in the absence of any provision in the policy to that effect."

We are driven to the conclusion that the rule of public policy in Wisconsin as established by the legislative act creating the defendant company and defining its rights and powers and by the decisions of its highest court is directly opposite to that established by the Supreme Court in the Ritter and Burt Cases, and that, in compliance with the direction of the Supreme Court as herein set forth in such case involving public policy, we must construe this Wisconsin contract in accord with its law and its Supreme Court's ruling.

It may be added incidentally that the case of Collins v. Met. Life Ins. Co., relied on by defendant's counsel, as a case directly in point, decided by intermediate courts adverse to recovery in Pennsylvania (where the action was allowed to be dismissed without prejudice before final judgment, however), and in Illinois, has by the Supreme Court of the latter state, all the judges concurring, been reversed and the company held liable. 232 Ill. 37, 83 N. E. 542, 14 L. R. A. (N. S.) 356, 122 Am. St. Rep. 54.

With this view that, touching questions of public policy, the state laws and decisions must control, we find no conflict apparent with the decision in the Burt Case. The question did not arise there. It seems in effect to have been conceded that the insurance contract was a commercial one, to be construed by the rules of commercial law independent of state decision. This is shown by the contract itself, a copy of which is appended to the brief of the appellants. It was the ordinary nonparticipating one for $5,000 in case of death, and contracting to pay a fixed surrender value of $2,194 upon maturity at the end of 20 years. The greater stress in the case was made upon the alleged right to show, notwithstanding the judicial conviction, that the insured was unjustly convicted and executed; that he did not in fact commit the crime of murder or participate therein, or, if he did, he was at the time insane and irresponsible.

We do not discuss or determine whether under the circumstances the children and heirs at law or the executors are entitled to recover, the determination of this question having been expressly waived by counsel.

The judgment, or more properly decree, of the court below, must be reversed, the cause remanded, and the defendant company held liable. Reversed.

WADDILL, District Judge (dissenting). I am unable to concur with the majority of the court in the view above expressed, believing as I do, that the case is controlled by the decision of the Supreme Court of the United States in Burt v. Union Central Insurance Co., 187 U. S. 362, 23 Sup. Ct. 139, 47 L. Ed. 216, and hence that the judgment of the lower court should be affirmed.

NOTE.—The following is the opinion of McDowell, District Judge, in the court below:

McDOWELL, District Judge. The first question is whether this court must, in deciding the question of liability of the insurance company, be guided by the principles of "general commercial law" (Carpenter v. Insurance Co., 16 Pet. 495, 511, 10 L. Ed. 1044; Washburn Co. v. Insurance Co., 179 U. S 1, 16, 21 Sup. Ct. 1, 45 L. Ed. 49; see, also, Sias v. Insurance Co. [C. C.] 8 Fed. 187, 188), or by some other rule. In the charter of the insurance company here, which is embodied in an act of the Legislature of Wisconsin, is the following clause: "Sec. 4. Persons who shall hereafter insure with the said corporation, and also their heirs, executors, administrators and assigns, continuing to be insured in said corporation, shall thereby become members thereof during the period they shall remain insured by such corporation, and no longer." It is argued that, in cases where the policy is payable on the death of the insured, this clause makes the heirs, executors, administrators, or assigns of one who had insured his own life for the benefit of his estate and assigns members of this (mutual) insurance company. On this construction of this section counsel for the claimants found a contention, rather difficult to express briefly, that the rights of the parties here are to be ascertained as they would be by a Wisconsin court. The best conclusion I have been able to reach is that, even if this construction of the above-quoted charter provision be sound, this court must here be guided by the principles of the general commercial law. But, partly because of this contention, and partly because of other deductions made by counsel for claimants founded on their construction of this section of the charter, it seems advisable to here discuss somewhat fully the meaning of this section. In this discussion I shall consider only the (possible) application of this section to cases where the policy is made payable on the death of the person whose life is insured. It is possible that this section was intended to apply only to cases where the policy is payable at a fixed future date, which may not arrive for a considerable time after the death of the person whose life is insured. But it seems unnecessary to consider the meaning of the section as applied to such cases; for in the case at bar the policy is payable on the death of the person whose life was insured, and if this section applies to both classes we are here only concerned as to its application in cases such as we have here.

(1) Where A. insures his own life for the benefit of his "heirs," executors, administrators, or assigns, and then assigns the policy to Z. (assuming the circumstances to be such as to make this permissible), it may be (A. still living) that Z. becomes a member of the society; but, if so, I incline to the opinion that Z., upon the assignment being made, becomes a member, not as the "assign" of one "who has insured with the corporation," but because he has become the assured—because he has become, within the meaning of the charter, the person who has "insured with the corporation."

(2) Where A. insures his own life for the benefit of his executors, administrators, or assigns, and dies, having made no assignment of the policy to any stranger, the construction put on section 4 by counsel for claimants is that on A.'s death his personal representatives and heirs become members of the society. Parenthetically, it should here be said that, if this be the true construction, it seems to me that it is, in the case at bar, the executors, and not the children, who would become members. But I find myself unable to agree that

this is the proper construction. The theory of life insurance, in case the policy is payable as it is here, is that the sum promised to be paid by the insurer will be paid as soon as reasonably may be after the death of the person whose life is insured. Hence I can see no reason why the personal representatives or devisees or distributees of the decedent should become members of the society. Their only interest is to forthwith collect the insurance money. Again, they do not continue to be insured. And under this section it is only the personal representatives or heirs, continuing to be insured, who become members.

(3) The case where this section seems to subserve a useful purpose, if it applies at all, is where A. (having an insurable interest) insures the life of B. for the benefit of A.'s successors in interest or assigns, and then, having made no assignment, dies, leaving B. living. I find nothing in the charter which forbids one to insure the life of another, where, impliedly, such insurance is not forbidden by statute or the policy of the law; and section 20 of the amendment of March 15, 1870, clearly contemplates such insurance. In such case, A. dying (B. living), the successors in interest of A. can "continue to be insured," and there is good reason why the charter of this mutual insurance company should provide that A.'s successors in interest shall become members, with a consequent voice in the management of the company.

(4) It is unnecessary to consider the case (assuming it to be a permissible hypothesis) where A. insures the life of B. for the benefit in the first instance of Z. Here in effect it is Z. (A. paying the premiums for Z.) who insures the life of B., and we have in principle the case last above considered.          ,

In the case at bar McCue insured his own life for the benefit of his executors, administrators, or assigns. By will he left the benefit of the policy to his children and appointed executors. Under this state of fact I am led to the conclusion that neither the executors nor the children have become members of the insurance company. If the construction that I put on section 4 be correct, it seems to me that there can be no shadow of foundation for the contention that this court must construe the contract here according to some supposed doctrine of the Wisconsin courts, rather than according to the doctrine of the general commercial law.          .

It follows that, if there be a decision, not a mere dictum, of the Supreme Court of the United States, fairly covering the exact question here presented, such decision is in this court absolutely binding. Burt v. Insurance Co., 187 U. S. 362, 23 Sup. Ct. 139, 47 L. Ed. 216, seems to me to be incontestably such a case. In that case Wm. E. Burt insured his own life under a policy the stipulations of which were in all material respects like those of the one at bar. The policy in case of death was payable to Anna M. Burt, his wife, if living; otherwise to his executors, administrators, or assigns. Shortly thereafter the insured and his wife assigned a half interest in the policy to S. M. Burt and H. R. Burt, who were creditors of the assignors. Thereafter Wm. E. Burt killed his wife. He thereafter, while under indictment, assigned the remaining half interest in the policy to said S. M. Burt and H. R. Burt. Wm. E. Burt was subsequently convicted of the murder of his wife, and was executed therefor. S. M. Burt and H. R. Burt, who were not only the assignees of the policy of insurance as above stated, but were also the sole heirs of Wm. E. Burt, sued at law on the policy. The petition, which set out the above facts, as well as some others to be mentioned, was demurred to. The trial court sustained the demurrer, and this judgment was affirmed by the Circuit Court of Appeals (105 Fed. 419, 44 C. C. A. 548), and again by the Supreme Court (181 U. S. 617, 22 Sup. Ct. 945, 45 L. Ed. 1030). There was in the petition an allegation that, notwithstanding the indictment and conviction, Wm. E. Burt did not commit or participate in the murder, but that, if he did, he was at the time insane.

As to this allegation, wherein the Burt Case is unlike the case at bar, it is sufficient to say that it was held that the judgment of the court which convicted Wm. E. Burt was based on a legal ascertainment that he was sane and that he was guilty of murder, which precluded further inquiry. It follows, therefore, that it was necessary in that case to decide identically the same question in principle which is presented in the case at bar. In neither the Burt Case nor here was there an express stipulation forbidding the company to contest its liability. It is true that in the opinion in the Burt Case it is said that "public policy forbids the insertion of a condition [the so-called "incontestable

clause"] whch would tend to induce crime, and, as it forbids the introduction of such a stipulation, it also forbids the enforcement of a contract under circumstances which cannot be lawfully stipulated for." It may be, as is insisted by counsel, that this language can be properly regarded as a dictum, as there was in the Burt policy no clause of the character thus declared to contravene public policy. But this leaves the facts in the Burt Case in principle the same as in the case at bar, and the question necessarily decided there was the one presented here. On the express ground that "it cannot be that one of the risks covered by a contract of insurance is the crime of the insured," and that "there is an implied obligation on his part to do nothing to wrongfully accelerate the maturity of the policy," it was there decided that the plaintiffs could not recover.

There is a doctrine, supported by some more or less persuasive authority, to the effect that, where public policy forbids the enforcement of a life insurance policy in behalf of those who claim under a felon and would otherwise be the beneficiaries, the court will seek a hand capable of taking and will enforce the policy for the benefit of such person. It seems to me that there are two reasons why this doctrine, if sound, cannot apply here:

(1) As I construe section 4 of the charter, there is no force in the contention that either the executors or the children of the insured have become members of the company and have acquired a right otherwise than through and under the insured.

(2) As I read the opinion in the Burt Case, it requires this court to hold that the parties to the contract of insurance here did not contemplate the possibility that the insured might commit a capital felony, and thereby bring about his own death, and that therefore the contract does not embrace the contingency of the death of the insured thus brought about. "It cannot be that one of the risks covered by a contract of insurance is the crime of the insured." Again, in making the contract of insurance, the insured impliedly obligated himself "to do nothing to wrongfully accelerate the maturity of the policy."

It follows that the insurance company is under no obligation to pay the sum demanded to any one. Hence there can be no power in this court to apply the doctrine contended for. It also follows that we are not concerned to ascertain the public policy of the state of Wisconsin, and that much the greater part of the exhaustive and admirable brief of the learned counsel for the claimants cannot be considered by this court. It can, as I think, only be considered by the Supreme Court when asked to overrule the Burt Case.

The question of estoppel can be very briefly disposed of. The insured, at the time the policy was issued, gave his note, payable in 6 months, for $427.50: the amount of the premium for 18 months. This note was payable, not to the company, but to the local solicitors personally. They in turn executed their note for the same amount, due at the same time, to the personal order of T. A. Cary, the state agent of the company, to which the note of the insured was attached as collateral, and both notes were sent to Mr. Cary. He thereupon sent the amount of the premium in cash to the company. The company had no knowledge concerning the making of the notes. After the charge of murder had been made against the insured, and while he was in jail on the charge, but while still protesting his innocence, he paid the note by checks drawn to the order of "T. A. Cary, Gen'l Agt." It seems to me that the payment by Mr. Cary to the company, long before the murder, completed the contract, absolved the insured of any liability to the company for this premium, and left Cary personally the creditor of the insured. In other words, even if there were otherwise room for a possible application of the doctrine of estoppel, there is here no foundation for such claim. The company in no sense received any premium payment after the charge of murder had been made against the insured.

From the foregoing the necessary conclusion is that neither the executors nor the children have a right to recover.

As to the premium money, I am of opinion that it should in part be ordered paid to the executors. The death of the insured came about under circumstances not contemplated by the parties to the contract, and hence is a contingency not covered by the contract. Quoad such a death there is no contract, and the consideration, except for the insurance from March 15, 1904, until

February 10, 1905, should be returned. Between the dates mentioned there was a contract and a risk by the company. In the judgment to be entered I shall apportion the fund in the registry as thus indicated.

We are now brought to the consideration of some questions rather technical in character. This proceeding was instituted in the state court, from which it was removed to this court, by a bill in equity and attachment served on a garnishee. The legatees, children of the insured, are the complainants, and the executors, alleged in the bill to be claiming as against the children the right to enforce the policy, are made defendants. Counsel have agreed, as they are interested only in securing a speedy determination on the merits, that no objection will be founded on the mere misarrangement or misjoinder of parties, and that either or both the executors and the children may be considered as parties plaintiff. However, I call attention to these facts because of their bearing on the question as to whether it is the law side or the equity side of this court on which this controversy should be determined.

From what has already been said it seems clear that we cannot hold this a case in which the executors, having the (apparent) legal right to recover, are forbidden by public policy to take, and that the children have a beneficial, as distinguished from a legal, interest entitling them to sue. As a matter of law, I think that the (apparent) right to sue is vested in the executors, and in them only. Schouler, Ex'rs and Adm'rs (2d Ed.) pp. 318–321, 326; Code 1904, §§ 2706, 2708. It follows that this is in its essential nature an assertion of a cause of action which is purely legal, and not equitable in character.

It is believed that the state statute (section 2964, Code 1904), which authorizes the prosecution of a purely legal cause of action by bill in equity and attachment, does not, on removal, give the federal court on its equity side jurisdiction of such an action as is the one at bar. That the existence of the lien of an attachment (acquired only at or after the institution of the suit) does not change this result seems to be established by the following authorities: Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358; Cates v. Allen, 149 U. S. 451, 13 Sup. Ct. 883, 977, 37 L. Ed. 804; Hollins v. Brierfield, 150 U. S. 371, 378, 14 Sup. Ct. 127, 37 L. Ed. 1113; Putney v. Whitmire (C. C.) 66 Fed. 388; Tompkins v. Catawba Mills (C. C.) 82 Fed. 782; Bank v. Prager, 91 Fed. 692, 34 C. C. A. 51; Viquesney v. Allen, 131 Fed. 21, 65 C. C. A. 259. Under these cases, if I read them correctly, the lien which can give a federal equity court jurisdiction must have been in existence prior to the institution of the suit.

It follows that this cause would regularly be ordered docketed on the law side of this court and the (proper) plaintiffs required to file a declaration. Under the agreement of counsel this course is not necessary. The jury has been waived by proper stipulation. As the court is to decide the case, the bill can, under the agreement, be treated as a declaration filed by the proper parties, and the judgment of the court entered in the common-law order book.

The answer of the defendant company contains what is in effect a plea of payment into court under sections 3296, 3297, Code 1904. Under the facts here, this defendant should be adjudged its costs.