# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

HUGH COLLINS, Exr., Plaintiff in Error, *vs.* THE METRO-POLITAN LIFE INSURANCE Co. Defendant in Error.

*Opinion filed December 17, 1907—Rehearing denied Feb. 7, 1908.*

1. PUBLIC POLICY—*declaration of public policy in constitution is conclusive.* The public policy of a State is to be sought for in its constitution, legislative enactments and judicial decisions; but if the constitution declares the public policy of the State upon a particular subject, such declaration is conclusive and must be accepted by the legislative and judicial departments.

2. SAME—*public policy of Illinois is against forfeiture of estate for conviction of crime.* The public policy of Illinois, as evidenced by the constitution and the statutes relating to the descent and devise of property, is against the forfeiture of estate or property rights as the result of a conviction for crime.

3. INSURANCE—*legal execution of insured for a crime does not bar suit on policy.* The legal execution of the insured for a crime committed by him is no defense, in Illinois, to a suit upon his policy by his personal representatives, in the absence of any provision of the policy exempting the company from liability in that event.

4. RES JUDICATA—*plea of res judicata must show a final judgment.* A plea of *res judicata* is fatally defective which fails to show a final judgment by a court of competent jurisdiction.

WRIT OF ERROR to the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. L. C. RUTH, Judge, presiding.

This is an action on a life insurance policy issued by the Metropolitan Life Insurance Company on the life of Robert Kilpatrick. The provisions of the policy are set out in the declaration, one of which is, that the policy should be incontestable after two years except for the non-payment of premiums or for fraud.

Two defenses are set up in the pleas of the insurance company: First, that Kilpatrick was indicted, tried, convicted and executed for murder; second, that in 1903 the plaintiff commenced a suit in the court of common pleas of Philadelphia against the insurance company on the same policy declared on in this suit; that a rule was entered upon the defendant by that court to file its affidavit of defense; that the defendant filed its affidavit, setting up the indictment, trial, conviction and execution of Kilpatrick on the charge of murder, and that it was adjudged and decided by said court that on the ground of public policy, the insured having been executed for a crime, the plaintiff could not recover; that the plaintiff took an appeal to the superior court of Pennsylvania, and upon such appeal the superior court decided that the facts alleged in the affidavit constituted a good defense to said suit and dismissed the plaintiff's appeal at the cost of the plaintiff, but without prejudice. The plea setting up the latter defense contained averments of facts showing jurisdiction of the court over the parties and subject matter. The plaintiff below demurred to the pleas. The demurrer was overruled, and the plaintiff electing to abide his demurrer, the court gave judgment against him for costs. Upon an appeal to the Appellate Court for the First District the judgment of the circuit court of Cook county was affirmed. The case comes

to this court on a certificate of importance, the amount involved being less than $1000.

PATTISON & SHAW, (WILLIAM H. HOLLY, of counsel,) for plaintiff in error:

The liability of the insurer is not avoided, on the ground of public policy, by the fact that the insured takes his own life, is executed on conviction for crime, or killed while in the commission of a felony.   Greenhood on Public Policy, pp. 1, 2; *Lord* v. *Doll,* 12 Mass. 115; *Harper* v. *Insurance Co.* 19 Mo. 507; *McDonald* v. *Triple Alliance,* 57 Mo. App. 87.

The plea of former adjudication is not sufficient, as the judgment of the court of Pennsylvania therein set out was not a final judgment, and therefore not a bar to this action. 1 Herman on Estoppel, 27, 65; 24 Am. & Eng. Ency. of Law, (2d ed.) 793; 13 id. 24; *Agnew* v. *Bank,* 96 N. W. Rep. 189; *Hurst* v. *Everett,* 21 Fed. Rep. 218.

HOYNE, O'CONNOR & IRWIN, for defendant in error:

An order of court reversing a judgment is a final judgment as to the facts upon which the decision of the court was based. *People* v. *Cohen,* 219 Ill. 200; *In re Estate of Maher,* 204 id. 25; *Trust Co.* v. *Railway Co.* 217 id. 504; *Heimann* v. *Wilke,* 219 id. 310.

There can be no recovery where the insured is hanged for the commission of a crime and suit on the policy is brought by the legal representative of the insured or one claiming through the insured.   Therefore there can be no recovery, in such a case, upon a policy payable to the legal representative of the insured.   *Collins* v. *Insurance Co.* 27 Pa. 353; *Cleaver* v. *Life Ass.* 1 L. R. Q. B. 147.

Death in consequence of crime is not one of the risks covered by a contract of insurance.   *Burt* v. *Insurance Co.* 187 U. S. 362; *Supreme Commandery* v. *Ainsworth,* 71 Ala. 436; *Ritter* v. *Insurance Co.* 169 U. S. 139.

Public policy will not permit a recovery by one who seeks to profit by his own wrong or by the wrong of another through whom he claims. *Schreiner* v. *High Court,* 35 Ill. App. 576; *Knights of Honor* v. *Menkhausen,* 209 Ill. 277; *Supreme Lodge* v. *Kutscher,* 72 Ill. App. 462.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Whether the legal execution of the assured for a crime committed by him constitutes a defense to an action by his legal representative on a life insurance policy is a question of first impression in this State. Where this defense has been sustained it is generally upon the ground that it is contrary to public policy to permit a recovery where the death is in consequence of a violation of the law. This is the basis of the decision of this case by the Appellate Court and is the main reason urged here in support of the judgment below.

It is said by the defendant in error that to permit a recovery on this policy would be contrary to the public policy of this State, as it would tend to remove a restraint thrown around persons who are tempted to commit crimes. The argument rests upon the same grounds that were urged centuries ago in support of the now obsolete doctrine of attainder and corruption of blood. In the earlier history of the common law various consequences other than the punishment of the offender followed conviction for felony, and in some instances the causing of a death by mere misadventure or negligence was visited with certain forfeitures and penalties. Without attempting historical accuracy, the law of England provided that all the property, real and personal, of one attainted should be forfeited and his blood so corrupted that nothing could pass by inheritance to, from or through him. He could not sue, except to have his attainder reversed. Thus the wife, children and collateral relations of the attainted person suffered with him. As said by Bishop: "When the tree fell it brought down all its

branches." (1 Bishop on Crim. Law, sec. 968.) As further illustrating the rigor of the old English law, it was provided that if a man be indicted for felony and flees, he forfeits by flight his goods; and "he that committeth homicide by misadventure shall forfeit his goods; and so shall he which doth kill a man in his own defense forfeit his goods; and likewise he that killeth himself and is *felo de se* shall forfeit his goods; and he that being indicted to felony shall stand mute and not answer directly, or challenge peremptorily above twenty persons, shall forfeit his goods."

These ancient doctrines, whether resting upon grounds of public policy or upon the other reason which is sometimes put forth, that the government is entitled to the goods of the felon as compensation for the injury done and the expense occasioned, have failed to satisfy the conscience and judgment of courts of later periods in England and have never had a potential existence in American jurisprudence. The constitution of the United States provides that "no attainder of treason shall work corruption of blood or forfeiture except during the life of the person attainted," and by an act of Congress passed in 1790 all corruption of blood and forfeitures, whether for treason or felony, as to convictions under the Federal law, were abolished. This doctrine never had any existence in Illinois, even in the modified form which seems to be recognized in the Federal constitution. In all the constitutions adopted in this State a provision similar to the one found in section 11 of article 2 of the constitution of 1870 is to be found. Thus, the constitution of 1818 provided: "No *ex post facto* law, nor any other law impairing the validity of contracts, shall ever be made, and no conviction shall work corruption of blood or forfeiture of estate." The constitution of 1848 contained the same clause, while the constitution of 1870 declares: "All penalties shall be proportioned to the nature of the offense, and no conviction shall work corruption of blood or forfeiture of estate; nor shall any person be trans-

ported out of the State for any offense committed within the same."

There are in these several constitutional provisions clear and unequivocal declarations of the public policy of this State to the effect that ño forfeiture of property rights shall follow conviction for crime. This public policy is further manifested by our statute in regard to descent of property in case of intestacy, and the general power of disposition of property by will, conferred by our Statute of Wills. In none of these statutes is the right conferred in respect to property made to depend on the manner or cause of the death of the owner. To hold that the property of one who was executed in this State for a crime was not subject to the same law of descent and devise as property generally, would be nothing less than judicial legislation by engrafting exceptions in statutes where none exist by the language of the law. Statutes of descent and devise are legislative declarations of the public policy of the State on the subjects to which they relate. The rules of the common law on these subjects have been wholly superseded by our statutes. (*Kochersperger* v. *Drake,* 167 Ill. 122; *Storrs* v. *St. Luke's Hospital,* 180 id. 368; *Sayles* v. *Christie,* 187 id. 420; *In re Mulford,* 217 id. 242.) Statutes of descent and devise similar to ours have generally been held not to exclude an heir or devisee from the benefits of these statutes on the ground that the heir or devisee had feloniously and intentionally destroyed the life of the person from whom the legacy or inheritance was expected. The court of appeals of New York, in *Riggs* v. *Palmer,* 115 N. Y. 506, (5 L. R. A. 340,) by a divided court decided against the right of a devisee who had murdered the testator to take under the will; but this case has not generally been regarded as sound by the other courts. In a well considered case in Nebraska the Supreme Court of that State retracted its first opinion in the case, and upon a rehearing held that, under a statute of descent similar to ours, the fact that the father had fe-

loniously murdered his child did not prevent the operation of the Statute of Descent and that the felon inherited the estate of his victim. (*Shellenberger* v. *Ransom,* 41 Neb. 641; 25 L. R. A. 564.) The Supreme Court of North Carolina, in *Owens* v. *Owens,* 100 N. C. 240, decided that the fact that the wife had been convicted of being an accessory before the fact for the murder of her husband furnished no legal reason for denying her a dower in her husband's real estate. Another case in point is found in *Deem* v. *Milliken,* 6 Ohio Cir. Ct. 357. In this case the heir had murdered the ancestor, and it was held that he was entitled to inherit. The case of *Carpenter's Appeal,* 170 Pa. 203, (29 L. R. A. 145,) holds that one who kills his ancestor for an estate that would naturally come to him under the statutes of descent and distribution, may take it under a constitution prohibiting attainders working corruption of blood and forfeitures of estates and under statutes providing no penalty for murder except by hanging. We cite these cases, but not for the purpose of approving them. The question decided in them is not involved here. We refer to these cases merely to show that the courts refused, in the face of a plain statutory declaration of the public policy of the State, to interpolate, by construction, an exception thereto.

In *Holdom* v. *Ancient Order of United Workmen,* 159 Ill. 619, this court held that an insane beneficiary who murdered the assured could recover. The cases of *Shellenberger* v. *Ransom* and *Owens* v. *Owens, supra,* are cited with approval by this court upon the general proposition that for the courts to declare a forfeiture for crime where the legislature has remained silent is legislation by judicial tribunals,—a subject with which they have no concern. These cases are much stronger than the one at bar. There is much more room for holding that one who has been the guilty agent in accelerating a death, as a result of which he expects to come into an inheritance or legacy or a benefit under

an insurance policy, should be denied the benefits of his own wrong on grounds of public policy, than there is for denying innocent heirs, devisees or beneficiaries their rights because the person through whom they claim was executed for crime. This court held in *Knights of Honor* v. *Menkhausen,* 209 Ill. 277, that while a beneficiary who has murdered the assured could not recover, still the heirs of the assured who are within the class of eligible beneficiaries were entitled to recover although not named in the certificate as beneficiaries. The public policy of a State is to be sought for in its constitution, legislative enactments and judicial decisions. When the sovereign power of the State has by written constitution declared the public policy of the State on a particular subject, the legislative and judicial depart-ments of the government must accept such declaration as final. When the legislature has declared, by law, the pub-lic policy of the State, the judicial department must remain silent, and if a modification or change in such policy is de-sired the law-making department must be applied to, and not the judiciary, whose function is to declare the law but not to make it. Limiting their actions to questions left open by the constitution and the statutes, courts may, no doubt, apply the principles of the common law to the re-quirements of the social, moral and material conditions of the people of the State and declare what rule of public pol-icy seems best adapted to promote the peace, good order and general welfare of the community; hence arises the rule that the decisions of its courts are to be investigated in determining the public policy of any government.

An insurance policy payable to the estate or personal representatives of the assured is a species of property. It is in the nature of a chose in action, which, subject to cer-tain conditions, varying according to the terms of the con-tract, is payable upon the contingency of death or at a stated time. Life insurance has become an important factor in the commercial and social life of our people. To protect

their credit, save their estates from embarrassment and provide for dependent ones, the people of this State pay annually over $30,000,000 in premiums for life insurance. (See Official Report of Commissioner of Insurance, part 2, p. 6.) The amount of insurance carried is approximately $1,000,000,000. Why should this enormous property interest be subject to any different conditions than those applying to any other property owned by the people? If a man who is executed for crime has at his death $1000 in real estate, $1000 in chattels and $1000 life insurance payable to his estate, his real estate descends to his heir and his personal chattels to his administrator, but the $1000 life insurance must be left in the hands of the company who has received the premiums because it is said to be contrary to public policy to require the company to pay, lest by so doing it lend encouragement to other policy holders to seek murder, and execution therefor, in order that their estates or heirs might profit thereby. This is defendant in error's position. This contention seems to border closely on the absurd. We know of no rule of public policy in this State that will enforce this species of forfeiture, but there is a rule of law which has often been applied when two parties make a valid contract and the same has been completely performed by one party and nothing remains except the performance by the other, which will compel performance or award damages for the default against the delinquent party.

We are aware that courts have not always reached the same conclusion upon this question. So far as we are advised, all the cases in which the opposite conclusion has been reached are based upon the English case, *Amicable Society* v. *Bolland,* 4 Bligh, (N. R.) 194, decided by the House of Lords in 1830. The facts in that case as stated by the Lord Chancellor are: "In January, 1815, Henry Fauntleroy insured his life with the Amicable Insurance Society. In the month of May, in the same year, he committed a forgery

on the Bank of England. He continued to pay the premiums upon his insurance for a considerable period of time. In the year 1824 he was apprehended, and on the 29th of October in that year he was declared a bankrupt and an assignment of his effects was made to the respondent. On the following day, the 30th of October, he was tried for forgery, found guilty and sentenced to death, and in the month of November following was executed." The court held that there could be no recovery. The grounds of the decision were, that to allow a recovery would "take away one of those restraints operating on the minds of men against the commission of crime."

It should be borne in mind that forfeitures for the commission of crime were enforced in England at the time of this decision, and continued to be, with more or less severity, until abolished by 33 and 34 Victoria, passed in 1870. (1 Bouvier's Law Dict. p. 446; Schouler on Wills, sec. 33.) The decision in the *Bolland case* was based on the ground of public policy, and no doubt was in strict accordance with the established policy of Great Britain at that time. As a declaration of the public policy of the English government at the time the decision was announced it must stand as conclusive evidence of such policy, but it is no evidence whatever that the same public policy prevails in any other nation or government. Each nation or State having the power to adopt a constitution and legislate for itself necessarily has the inherent power to declare its own rules of public policy. There is nothing in international law or the comity between our States that requires our courts to enforce the consequences following the conviction for felony in obedience to the public policy of the State where the conviction is had, when to do so would be to depart from our own public policy on the same subject. A few citations will establish this principle.

All the authorities agree that a slave, on touching the land where slavery is not recognized, becomes free. (*Purdy*

v. *New York, etc. Railroad Co.* 61 N. Y. 353; *Bailey* v. *Cromwell*, 3 Scam. 71; *Kinney* v. *Cook*, id. 232; *Hone* v. *Ammons*, 14 Ill. 29; *Rodney* v. *Illinois Central Railroad Co.* 19 id. 42.) In the case last cited this court said: "The State of Illinois, as one of the independent sovereignties of the Union, will determine the condition of all persons within the State according to her own laws and institutions, and can be limited or controlled in this respect only by the constitution of the United States and the laws of Congress made under authority of that instrument. Slavery in the States where it exists has its foundation in the municipal regulations of such States, which have no extra-territorial operation and no binding force in another sovereignty." When one has been declared civilly dead under the law of his domicile, such sentence will not be regarded by other nations as having any extra-territorial effect. (Wharton on Conflict of Laws, sec. 107.) "Civil death, says Brocher, raises a feeling of repulsion, whether the incapacity is presented singly or as a consequent of another punishment. It is a barbarism condemned by justice, by reason and by morality. The States which have abolished it cannot be held to accept it from the hands of a foreign legislature." (Wharton on Conflict of Laws, sec. 107, note.) In regard to attainder for crime the rule is the same. Wharton, in his work on Conflict of Laws, says (vol. 1, p. 254): "So far as England is concerned, while her shores have been the refuge of multitudes of persons who have been attainted and consigned to infamy by their respective sovereigns, there is no case on record where such disabilities have been enforced by English courts." Story, in his work on Conflict of Laws, says that "an American court would deem them [such incapacities] purely local and incapable of being enforced here." A person who by reason of his conviction for an infamous offense cannot be a witness will not be incapacitated in another jurisdiction where the incapacity does not exist. (Wharton on Crim. Evidence, sec. 363.) The

whole doctrine is condensed in one sentence by Wharton, as follows: "There is no such thing as ubiquity of national disabilities." (See Conflict of Laws, secs. 7, 8, 101, 104, 113.) The question, therefore, is one to be determined by our own local rules of public policy. In view of these rules as evidenced by our constitution and the statutes above referred to, we conclude that the execution of the assured for crime is no defense against an action upon a life insurance policy held by the person executed, in the absence of a stipulation exempting the company from liability for a death from this cause.

In view of the conclusions we have reached upon the question already discussed, the effect of the incontestable clause in this policy becomes of no importance and need not be further alluded to.

Regarding defendant in error's plea of *res judicata* but little need be said. It will be remembered that by that plea defendant in error sets up a proceeding on this policy in the State of Pennsylvania, and it is to be noted that the plea is fatally defective in that it contains no averment of a final judgment. The plea shows simply that a suit was commenced on this policy; that the company was ruled to present an affidavit of defense; that such affidavit was presented and it was adjudged sufficient. From this interlocutory order an appeal was taken to the superior court, where the ruling of the common pleas court was sustained. The case was not remanded for a trial and judgment, but the plaintiff was permitted to dismiss the case without prejudice. The rule is without exception that a plea of *res judicata* must show a final judgment entered by a court of competent jurisdiction. (24 Am. & Eng. Ency. of Law,—2d ed.—793, and cases there cited.) The demurrer to this plea, as well as to the one setting up the execution of the assured for crime, should have been sustained.

The judgment of the circuit court of Cook county and of the Appellate Court for the First District are reversed

and the cause remanded to the circuit court of Cook county, with directions to sustain the demurrer to the pleas, and for further proceedings in conformity with the views herein expressed.

*Reversed and remanded, with directions.*