MRS. MINNIE FIELDS *v.* METROPOLITAN LIFE INS. CO.*

(*Nashville.* December Term, 1922.)

Insurance. Life policy is payable after execution of insured for crime. In view of Constitution, article 1, section 12, prohibiting corruption of blood or forfeiture of estate and *deodands*, which establishes the public policy of the State as opposed to forfeitures for conviction for crimes, it is not contrary to public policy for a life insurance company to pay to the beneficiary the amount of the policy upon the life of one who had been executed by the State for murder.

Cases cited and approved: Collins v. Metropolitan Life Ins. Co., 232 Ill., 37; Mink's Case, 123 Mass., 422; Arnold v. Insurance Co., 131 Tenn., 720; Amicable Society v. Bolland, 4 Bligh (N. R.), 194; Burt v. Union Central Life Ins. Co., 187 U. S., 362; Northwestern Mut. Life Ins. Co. v. McCue, 223 U. S., 234; Collins v. Met. Life Ins. Co., 27 Pa. Super. Ct., 353; Knights of the Golden Rule v. Ainsworth, 71 Ala., 447; Am. National Ins. Co. v. Munson, 202 S. W., 987; Scarborough v. Am. Nat. Ins. Co., 171 N. C., 353.

Cases cited and distinguished: Parker-Harris Co. v. Tate, 135 Tenn., 514; Jackson v. Loyal Additional Ben. Ass'n., 140 Tenn., 495; Collins v. Met. Life Ins. Co., 232 Ill., 37.

Code cited and construed: Secs. 4231, 4030, 2265 (S.).

---

FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County.— HON. JAS. B. NEWMAN, Chancellor.

---

*For effect of execution of insured for crime, on right of accident insurance see notes in 14 L. R. A. (N. S.), 356 and L. R. A., 1918A, 898.

LURTON GOODPASTURE and HENRY GOODPASTURE, for appellant.

JOHN H. DEWITT, for appellee.

MR. H. G. MORRISON, Special Judge, delivered the opinion of the Court.

Mrs. Minnie Fields, as administratrix of Asbury Fields, filed her original bill to recover from the Metropolitan Life Insurance Company under two policies aggregating $460, with interest, and a penalty of twenty-five per cent. The bill charges that the insured, Asbury Field, was in due course of law convicted of murder and executed. The demurrer of defendant challenges the right to recover on the ground that legal execution is not within the causes of death for which liability under the policy could arise, because contrary to the public policy of the State which forbids insurance against crime and the circumstances thereof.

The chancellor overruled the demurrer, and the court of civil appeals affirmed the decree of the chancellor.

The sole question is one of law: May the beneficiary of a policy of life insurance recover the insurance in Tennessee in case the policy holder in due course of law is sentenced to death and executed?

The Tennessee Constitution provides (article 1, section 12):

"Sec. 12. *No Corruption of Blood or Forfeiture of Estates; No Deodands.*—That no conviction shall work corruption of blood or forfeiture of estate. The estate of such persons as shall destroy their own lives shall descend or vest as in case of natural death. If any person be killed

147 Tenn.—30

by casualty, there shall be no forfeiture in consequence thereof."

It should be noted that this section of the Constitution considers together and forbids corruption of blood and forfeitures upon conviction of crime or suicide and deodands. All of these doctrines obtained at the common law.

The doctrine of deodand (any personal chattel which, becoming the immediate instrument causing the death of a human creature, was forfeited to God) was discussed by this court in *Parker-Harris Co.* v. *Tate,* 135 Tenn., at page 514, 188 S. W., at page 55 (L. R. A., 1916F, 935). The court said:

"The doctrine fitly belonged to an age in which an action for a death negligently or tortiously caused was not permitted against the culpable person of true moral responsibility. If, however, that person's vehicle was, though inanimate, the occasion of his own death, it was a deodand for pious uses. Needless to say, historians record that the 'pious uses' under the control of the king and his almoner became a scandal which moderns would describe as being graft.

"The doctrine, after being subtly refined and pared down, was discarded in England by Stat. 9 and 10, Victoria, chapter 62. To the credit of American jurisprudence, from the outset the doctrine was deemed to be so repugnant to our ideas of justice as not to be included as a part of the common law of this country."

Thus in our Constitution, which is the first and highest declaration of public policy, the law of deodands, as it existed in England, was classed with those laws likewise obtaining in England, which worked corruption of blood, forfeitures, and attainders upon conviction for crimes.

At common law all the property, real and personal, of one attainted was forfeited and his blood so corrupted that nothing could pass by inheritance to, from, or through him. He could not sue except to have his attainder reversed. Thus the wife, children, and collateral relations of the attainted person suffered with him. *Collins* v. *Metropolitan Life Insurance Co.*, 232 Ill., 37, 83 N. E., 542, 14 L. R. A. (N. S.), p. 358, 122 Am. St. Rep., 54, 13 Ann. Cas., 129.

The section quoted above from our Constitution also deals with suicide. By the common law suicide was a felony and the law sought to prevent the crime by attaching to it an ignominous burial in a highway with a stake driven through the body and a forfeiture of goods. Synopsis of the Law of Crimes, Minor, p. 44; 4 Blackstone's Commentary, 190; *Mink's Case,* 123 Mass., 422, 25 Am. Rep., 109. The forfeiture for suicide, like the deodand, was prohibited by our Constitution.

In *Jackson* v. *Loyal Additional Ben. Ass'n,* 140 Tenn., 495, 205 S. W., 318, Jackson, the husband of the complainant, joined the association and took out a benefit certificate for $2,000, payable to his wife. He was a member in good standing until he died by his own hand, and the association resisted payment by reason of the suicide. This court said:

"Several courts of the highest repute have held that there can be no recovery under such circumstances. (Citing numerous cases.) In our opinion, however, the weight of the authority is to the contrary. (Citing cases.)"

Again the court says: "The reasons given by the courts denying recovery under such circumstances here presented are that there is an implied agreement against self-destruc-

tion by the insured in every insurance contract, and that a recovery under such circumstances would be a fraud on the insurer; that public policy forbids the enforcement of a contract matured by suicide; and, further, that neither the insured nor his estate, nor beneficiary, should profit by his wrong. (See note 8 L. R. A. [N. S.], 1125.)

"The idea that suicide is excluded from a contract of insurance by implication rests on the supposition that the rates of insurance are based on the theory that the insured will not take his own life. This is assumed in *Ritter* v. *Mutual Life Ins. Co.*, supra, and other cases following that authority.

"This assumption, however, is erroneous, as is noted by the supreme court of New Jersey, in *Campbell* v. *Supreme Conclave,* supra, and by the supreme court of Nebraska in *Lange* v. *Royal Highlanders,* supra.

"As a matter of fact, the mortality tables, upon which all insurance rates are computed, take into account deaths from every cause; deaths by suicide included. It therefore cannot be said that such a death is impliedly excluded from these contracts, when the consideration thereof rests on such a basis."

Again the court says: "Moreover, it is against the policy of this State to permit implications in insurance contracts. So far as life insurance proper is concerned, it is expressly provided by chapter 441 of the Acts of 1907, that the entire contract of insurance shall be contained in the policy. Not even written documents, such as applications, or medical examinations, can be looked to and taken as part of the contract, although referred to in the policy, unless physically embraced therein. *Arnold* v. *Insurance Co.,* 131 Tenn., 720, 177 S. W., 78, L. R. A., 1915E, 363."

Clearly, the policy of this State is settled and declared with respect of suicide. Now, why should the State have one policy with respect of life insurance in the case of a suicide, and another policy with respect of life insurance in the case of a person executed by the State? In the case of the suicide, a person perhaps of sound mind deliberately takes his own life, thereby accelerating the maturity of his policy and vesting in dependents and beneficiaries the amount of his policy. It is conceivable that this method of providing an estate for dependents might be the moving cause for the act of self-destruction. It is also conceivable that a person might deliberately put himself in the way to be legally executed as a means of self-destruction. The only reason assigned in the cases denying the proceeds of life insurance to beneficiaries in the case of executed persons is that of public policy.

There is only one case in the United States cited by counsel, and we have been able to find no other, which holds that the beneficiaries of the life policy of a person executed are entitled to recover—the case of *Collins* v. *Metropolitan Life Ins. Co.,* 232 Ill., 37, 83 N. E., 542, 14 L. R. A. (N. S.), 356, 122 Am. St. Rep., 54, 13 Ann. Cas., 129. The reasoning of this case so nearly accords with our views that it is copied at length:

"Whether the legal execution of the assured for a crime committed by him constitutes a defense to an action by his legal representative on a life insurance policy is a question of first impression in this State. Where this defense has been sustained it is generally upon the ground that it is contrary to public policy to permit a recovery where the death is in consequence of a violation of the law. This is the basis of the decision of this case by the appellate court

and is the main reason urged here in support of the judgment below.

"It is said by the defendant in error that to permit a recovery on this policy would be contrary to the public policy of this State, as it would tend to remove a restraint thrown around persons who are tempted to commit crimes. The argument rests upon the same grounds that were urged centuries ago in support of the now obsolete doctrine of attainder anad corruption of blood. In the earlier history of the common law various consequences other than the punishment of the offender followed conviction for felony, and in some instances the causing of a death by mere misadventure or negligence was visited with certain forfeitures and penalties. Without attempting historical accuracy, the law of England provided that all the property, real and personal, of one attainted, should be forfeited and his blood so corrupted that nothing could pass by inheritance to, from or through him. He could not sue, except to have his attainder reversed. Thus the wife, children, and collateral relations of the attainted person suffered with him. As said by Bishop: 'When the tree fell it brought down all its branches.' . . .

"There are in these several constitutional provisions clear and unequivocal declarations of the public policy of this State to the effect that no forfeiture of property rights shall follow conviction for crime. This public policy is further manifested by our statute in regard to descent of property in case of intestacy, and the general power of disposition of property by will, conferred by our statute of wills. In none of these statutes is the right conferred in respect to property made to depend on the manner or cause

of the death of the owner.   To hold that the property of
one who was executed in this State for a crime was not
subject to the same law of descent and devise as property
generally would be nothing less than judicial legislation
by ingrafting exceptions in statutes where none exist by
the language of the law.   Statutes of descent and. devise
are legislative declarations of the public policy of the
State on the subjects to which they relate.   The rules of
the common law on these subjects have been wholly super-
seded by our statutes.   . . .

"The public policy of a State is to be sought for in its
Constitution, legislative enactments and judicial· decisions.
When the sovereign power of the State has by written
Constitution declared the public policy of the State on a
particular subject, the legislative and judicial departments
of the government must accept such declaration as final.
When the legislature has declared, by law, the public policy
of the State, the judicial department must remain silent,
and if a modification or change in such policy is desired,
the lawmaking department must be applied to, and not the
judiciary, whose function is to declare the law but not to
make it.   Limiting their actions to questions left open
by the Constitution and the statutes, courts may, no doubt,
apply the principles of the common law to the require-
ments of the social, moral and material conditions of the
people of the State, and declare what rule of public policy
seems best adapted to promote the peace, good order and
general welfare of the community.   Hence arises the rule
that the decisions of its courts are to be investigated in
determining the public policy of any government.

"An insurance policy payable to the estate or personal
representatives of the assured is a species of property.   It

is in the nature of a chose in action, which, subject to certain conditions, varying according to the terms of the contract, is payable upon the contingency of death or at a stated time. Life insurance has become an important factor in the commercial and social life of our people. . . . Why should this enormous property interest be subject to any different conditions than those applying to any other property owned by the people? If a man who is executed for crime has at his death, $1,000 in real estate, $1,000 in chattels and $1,000 life insurance payable to his estate, his real estate descends to his heir and his personal chattels to his administrator, but the $1,000 life insurance must be left in the hands of the company which has received the premiums because it is said to be contrary to public policy to require the company to pay, lest by so doing it lend encouragement to other policy holders to seek murder, and execution therefor, in order that their estates or heirs might profit thereby. This is defendant in error's position. This contention seems to border closely on the absurd. We know of no rule of public policy in this State that will enforce this species of forfeiture, but there is a rule of law which has often been applied when two parties make a valid contract and the same has been completely performed by one party and nothing remains except the performance by the other, which will compel performance or award damages for the default against the delinquent party.

"We are aware that courts have not always reached the same conclusion upon this question. So far as we are advised, all the cases in which the opposite conclusion has been reached are based upon the English case, *Amicable*

*Society* v. *Bolland,* 4 Bligh (N. R.), 194, decided by the
House of Lords in 1830. . . . It should be borne in
mind that forfeitures for the commission of crime were
enforced in England at the time of this decision, and con-
tinued to be, with more or less severity, until abolished by
33 and 34 Victoria, passed in 1870. (1 Bouvier's Law Dict.
p. 446; Schouler on Wills, section 33.) The decision in the
Bolland Case was based on the ground of public pol-
icy, and no doubt was in strict accordance with the
established policy of Great Britain at that time. As
a declaration of the public policy of the English govern-
ment at the time the decision was announced it must stand
as conclusive evidence of such policy, but it is no evidence
whatever that the same public policy prevails in any other
nation or government. Each nation or State having the
power to adopt a constitution and legislate for itself nec-
essarily has the inherent power to declare its own rules of
public policy. There is nothing in international law or the
comity between our States that requires our courts to en-
force the consequences following the conviction for felony
in obedience to the public policy of the State where the
conviction is had, when to do so would be to depart from
our own public policy on the same subject. A few citations
will establish this principle."

The American cases which hold contrary to the Illinois
case above are as follows: *Burt* v. *Union Central Life Ins.
Co.,* 187 U. S., 362, 23 Sup. Ct., 139, 47 L. Ed., 216; *North-
western Mutual Life Ins. Co.* v. *McCue,* 223 U. S., 234, 32
Sup. Ct., 220, 56 L. Ed., 419, 38 L. R. A. (N. S.), 57; *Col-
lins* v. *Metropolitan Life Ins. Co.,* 27 Pa. Super. Ct., 353;
*Knights of the Golden Rule* v. *Ainsworth,* 71 Ala., 447, 46

Am. Rep., 332; *Am. National Ins. Co.* v. *Munson* (Tex. Civ. App.), 202 S. W., 987; *Scarborough* v. *Am. Nat'l Ins. Co.,* 171 N. C., 353, 88 S. E., 482, L. R. A., 1918A, 896, Ann. Cas., 1917D, 1181.

No one of these cases discussed the constitutional provision respecting attainders and forfeitures above referred to. Each one of them is based upon the English case of *Amicable Society* v. *Bolland,* English Reports, Full Print, House of Lords, Book 6, Bligh N. S. 10, 11, Dow & Clark, 1, 2, Clark & Finnelly, 1, 3. This case was decided in 1830 and is summed up by the Lord Chancellor in the following language:

"Lord Chancellor (9th July, 1830) : The proceedings in this case were instituted by the assignees of the estate and effects of the deceased Henry Fauntleroy, a bankrupt, to recover a sum of money on an insurance on his own life, effected by the bankrupt with the incorporated society for the insurance of lives, called 'The Amicable Society for a Perpetual Assurance Office;' and the case is of this description: Fauntleroy effected the policy in January, 1815, and paid the premiums on it up to 1824. On the 29th of October, 1824, a commission of bankruptcy was issued against Fauntleroy, who was duly declared bankrupt, and his estate and effects vested in the respondents, as his assignees under the commission. On the 28th October, 1824, Fauntleroy was indicted for felony,· and on the 30th of the month he was tried and convicted, and received sentence of death, and was afterwards executed; and the question is whether, under these circumstances, the assignees can recover from the insurance society the amount of the sum insured on Fauntleroy's life; that is, whether—the

party effecting the insurance having committed felony, and having been tried, convicted, and executed for felony— the parties representing him, and claiming under him in his right, can maintain the suit. I listened with the utmost attention to the arguments at the bar, as did the noble Lord (Radnor) who is now present, and was present at the hearing of the cause; and we have come to the conclusion that the assignees are not entitled to maintain the suit, and simply on this consideration: Suppose that in the policy this risk had been insured in terms—that in the event of the party effecting the insurance being executed for a capital felony, the money should become payable—is it possible that a claim in right of a party effecting such an insurance could be maintained, or that the the insurance should not be held void as affording encouragement to crime, and being contrary to public policy? If such a policy could not be sustained where a risk of that kind was mentioned in direct terms and language, how can you give effect to a policy if it in reality involves that condition?

"On this short and plain ground, we are of opinion that the claim cannot be sustained, and that the judgment of the court below must be reversed."

It is the declared policy of this State that the proceeds of life insurance effected by a husband on his own life are for the benefit of his widow and children and the fund is free from claims of creditors. Sections 4231, 4030, 2265, Shannon's Code.

Is there any reason why one cause of the death of a father should deprive the widow and children of the benefit of his life insurance and all other causes of death, in-

cluding drugs and vices, should permit them to benefit? The economic loss to them is the same, whether he dies of electrocution at the hand of.the State or of vice or disease. There can be no basis in reason and in common sense to hold in reverence the ancient legal dogmas of other centuries. Life insurance has its strongest hold on the imagination because of its benevolent and self-sacrificing aspects. It enables dependents to survive and maintain themselves and to withstand the economic shock of the loss of the head of the family and provider. It is fanciful to say that the cancellation of an insurance policy will restrain a man from crime. The law of the land, the machinery for its enforcement, and the restraints of conscience do this.

The decree of the court of civil appeals will be affirmed.