MODERN WOODMEN OF AMERICA v. KEHOE.

(In Banc. March 25, 1946. Suggestion of Error Overruled May 13, 1946.)

[25 So. (2d) 463. No. 36034.]

**Stone & Stone,** of Coffeeville, and **Geo. G. Perrin** and **Geo. H. McDonald,** both of Rock Island, Ill., for appellant.

756

**John Horan,** of Water Valley, for appellee.

Argued orally by **W. I. Stone**, for appellant, and by **John Horan**, for appellee.

**Alexander, J.**, delivered the opinion of the court.

This case involves the construction of a fraternal life insurance policy which provided that ''If his death shall

occur . . . in consequence of any violation of law . . . then said benefit certificate shall be null and void and of no effect.'' The insured died by legal execution, and suit is by the widow, as beneficiary. The by-laws, expressly made a part of the policy, contain the following provision: ''Sec. 25. Incontestability.—After any certificate of insurance issued by this Society has been in force during the lifetime of the member for two full certificate years, it shall be incontestable except for non-payment of premiums and except with respect to the provisions contained in any rider attached thereto providing for additional benefits, and except also for risks not assumed.''

There is no disagreement as to the payment of premiums or is any other ground for avoidance asserted except the death in consequence of a violation of criminal law. Unless, therefore, death by execution is one of the ''risks not assumed,'' the incontestable clause would bar a defense based upon that ground. Before considering this question, it is well to refer to the provision of the policy first above quoted. Consideration of this provision would require a construction of the words ''in consequence of any violation of law . . . '' and would invite a resolving of the uncertainty whether a legal execution of the insured is ''a consequence'' of his illegal act of murder within the meaning of the policy. This, we need not undertake, unless 1) the language compels the conclusion that such death is the consequence of his criminal act, and 2) it would be against our public policy to allow such risk to be assumed by the appellant. If it is not against our public policy, the question is open whether the insurer is barred from setting up the defense, in view of the incontestable clause.

If the risk of death at the hands of the law could be assumed, as not being a violation of public policy, then the exclusion of such risk must arise from the terms of the contract and, unless a defense based thereon is precluded by the incontestable clause, and provided it is

held a consequence of his criminal act, the beneficiary could not recover. If, therefore, it is a risk that could lawfully be assumed, a waiver of a defense based thereon could lawfully be made.

That such a risk is not against public policy is now abundantly established. Northwestern Mut. Life Ins. Co. v. Johnson, 254 U. S. 96, 41 S. Ct. 47, 65 L. Ed. 155; Collins v. Metropolitan Life Ins. Co., 232 Ill. 37, 83 N. E. 542, 14 L. R. A. (N. S.), 356, 122 Am. St. Rep. 54, 13 Ann. Cas. 129; Fields v. Metropolitan Life Ins. Co., 147 Tenn. 464, 249 S. W. 798, 36 A. L. R. 1250 (with extensive annotation at page 1255).

Wherefore, such risk was one which the insurer could legally assume, and, regardless of whether the subsequent death was in consequence of a criminal act, the policy was a valid contract and as such remained in force for over twenty years. Circumstances which might have arisen subsequent to its lawful inception were such as be interposed as defenses to a suit upon the policy. Fraud in its procurement could be invoked to avoid liability under the policy. So also, the policy was subject to avoidance by subsequent events, such as non-payment of premiums, death by suicide, or in consequence of a criminal act. It would not be correct to say that the policy was never in force nor to say that the appellee, after the death of the insured, had no policy. Vetter v. Massachusetts Nat. Life Association, 29 App. Div. 72, 51 N. Y. S. 393. The simple fact is that she did have such policy and sued upon it. That it is still a valid obligation could be shown by its terms, supported by proof that the premiums had been paid. It is not void per se but per quod. The questions here raised have to do with the insurer's contest. If it is to be avoided, the insurer must act. Under its policy it would have been free to contest it upon any proper grounds whether mentioned in the contract or not. Yet, it chose to waive such right by fixing a two year period of limitation within which alone it could contest its liability. Ramsey v. Old Colony

Life Ins. Co., 297 Ill. 592, 131 N. E. 108. See also numerous citations in the annotations found in 6 A. L. R. 441, 448; 13 Id., pp. 672, 674; 35 Id., p. 1491, 1493; Weeks v. New York Life Ins. Co., 128 S. C. 223 122 S. E. 586, 35 A. L. R. 1482, with annotation in 35 A. L. R. 1491, 1492.

The risk of death at some time was of course assumed by the insurer. But for the exceptions as to the cause of death, the insurer would be liable in the event of death, however caused, provided the policy was in force and there was no fraud or misrepresentation involved in its procurement. Yet, these are defenses against liability, in other words, bases for contesting liability. The appellant, however, has waived all defenses by making the policy incontestable after two years from its date, except as above noted. This clause is not an assurance against the results of crime but is assurance against the hazard of litigation. Mutual Ins. Co. of New York v. Lovejoy, 201 Ala. 337, 78 So. 299, L. R. A. 1918D, 860; Supreme Lodge K. P. v. Overton, 203 Ala. 193, 196, 82 So. 443, 445, 16 A. L. R. 649; United Order of the Golden Cross v. Overton, 203 Ala. 335, 83 So. 59, 13 A. L. R. 672.

Having put out of view the question whether death by execution is a risk excluded by public policy, the saving phrase "except also for risks not assumed" has no force except such as is found in specific exceptions in the contract or its attached riders, or such as would be held as contrary to public policy. The incontestable clause is to be read in connection with the other provisions of the policy which, but for the clause, would provide a ground for contest. It would be meaningless if the words "except for risks not assumed" preserved the right to contest all claims arising out of the risks which the contract specifically excluded. If it did not assume a certain risk, the words would be unnecessary with respect thereto. Thus Section 25 of the by-laws (except as to non-payment of premiums and special provisions in an attached rider) would mean nothing, for the policy could in no case be contestable for risks assumed, and the waiver of con-

testability could refer only to those risks not assumed. As held in Sun Life Ins. Co. v. Taylor, 108 Ky. 408, 56 S. W. 668, 94 Am. St. Rep. 383, ''The language providing that the policy should be incontestable does not restrict it to any particular ground of contest, but it is broad and comprehensive enough to embrace any and every defense which might have been made to it before the expiration'' of the contestable period. It did not undertake to incur. any risk imposed upon it by fraud or misrepresentation, nor the risk of insuring one who should later hasten the maturity of the risk by his own suicidal act. Nor for that matter did it intend to assume the risks falling within the meaning of the phrase ''in consequence of any violation of criminal law.'' Yet it did assume the risk of its failure to contest its liability upon such grounds within the contractual period. It could interpose its contest upon any of those grounds provided it acted within the contestable two year period. As stated in American Nat. Ins. Co. v. Tabor, 111 Tex. 155, 230 S. W. 397, 399, dealing with an incontestable clause written into the contract by statute. ''The subdivision allows the insuring company to fix a period of time, not to exceed two years, during which it may make fully available to itself all the legal consequences of fraud which ought to be discovered through the exercise of proper diligence; but, after the expiration of the period fixed, the subdivision eliminates all defenses, save those specially mentioned. The parties could not, by contract, put something into the policy which was repugnant to the mandatory statute, and thus destroy a benefit to the insured which the statute was designed to guarantee. Hence the attempted reservation by the insurer of the right to interpose fraud by way of defense to a suit to enforce payment of the policy after it had been issued more than two years was void.''

Cases involving fraud would seem to present the strongest defense since it affects the validity of the policy ab initio. Yet, the incontestable clause has been held effective to bar a contest on such grounds. Metropolitan

Life Ins. Co. v. Peeler, 71 Okl. 238, 176 P. 939, 6 A. L. R. 441, which annotations at p. 452, also 13 A. L. R. 674, 675; Weeks v. New York Life Ins. Co., supra.

Suicide, involving as it does a deliberate act, and upon occasion done purposely to hasten maturity of the obligation, as well as inviting considerations of public policy, would seem also to challenge the power of the incontestable clause to forbid recovery. Yet, suicide has long since been accepted as one of the risks assumed by the insurer and subject to the incontestable clause. See authorities cited in preceding paragraph. Indeed, its mortality tables take such contingency into account. Jackson v. Loyal Additional Ben. Association, 140 Tenn. 495, 205 S. W. 318; Fields v. Metropolitan Life Ins. Co., supra.

There is no occasion to compare the relative risk of suicide against the possibility that the insured may, as an incident of his criminal act, be tried, convicted, sentenced, and executed. Arguments based upon the degree of risk are for the insurer in fixing its rates. Public policy is a matter for legislative inquiry and determination or judicial construction.

So that for two years the insurer retained the right to avoid the contract upon any proper contest. Thereafter, it could contest it only upon the grounds above set out, none of which are found here to exist. The circumstance that death is here traceable back to the crime of murder stimulates adverse reactions which are dissipated by the focused light of the general and now firmly established principle that such eventuality was a risk which the insured could assume, and also, even as in the case of suicide, could retain as a basis for a future contest. Such right of contest could in turn be waived either by a failure to include it within the excepted risks assumed, or by restricting its right to assert such contest within the period of the incontestable clause.

The waiver, therefore, includes the right to contest the policy upon the ground that the insured came to his death in consequence of a violation of criminal law.

United Order of the Golden Cross v. Overton, supra; Philadelphia Life Ins. Co. v. Arnold, 97 S. C. 418, 81 S. E. 964, Ann. Cas. 1916C, 706; Ex parte Weil, 201 Ala. 409, 78 So. 528; Weil v. Travelers' Ins. Co., 16 Ala. App. 641, 80 So. 348; Murphy v. Metropolitan Life Ins. Co., 152 Ga. 393, 110 S. E. 178; Supreme Lodge K. P. v. Overton, supra; Sandel v. Philadelphia Life Ins. Co., 128 S. C. 239, 122 S. E. 591; Weil v. Travelers Ins. Co., 16 Ala. App. 641, 80 So. 352; Sun Life Insurance Co. v. Taylor, supra; Fields v. Metropolitan Life Ins. Co., supra; Weeks v. New York Life Ins. Co., supra; Mutual Life Ins. Co. of New York v. Lovejoy, supra; Kelly v. North American Union, 146 Ill. App. 611; Hanisch v. North American Union, 170 Ill. App. 79; Cooley, Briefs on Insurance, (2d Ed.), Vol. 6, p. 5201; 29 Am. Jur., Insurance, Sec. 886, p. 680.

Lavender v. Volunteer Life Insurance Co., 171 Miss. 169 157 So. 101, 104, should be noticed. The insured was killed as a result of a violation of law. The policy contained a rider providing for double indemnity in the event of accidental death. This rider, only, referred to death from such cause. The face of the policy was paid despite death resulting from such cause and the contest was directed solely to the double indemnity contract. The language of the rider was ''This agreement to pay double the amount insured in event of death as above recited does not cover . . . death resulting from any violation of the law . . . '' The Court stated ''In other words, the double indemnity clause did not insure against a death resulting from said causes.''

It will be seen therefore that death from such cause was not only a risk not assumed but one which was affirmatively excluded. In Scarborough v. American Nat. Insurance Co., 171 N. C. 353, 88 S. E. 482, L. R. A. 1918A, 896, Ann. Cas. 1917D 1181 death by legal execution was excluded from the risks assumed under the mandate of a recognized public policy. This case is typical of the earlier cases which excluded this risk as against public

policy and which have been later repudiated as shown by the annotated cases above set forth. Yet it is in point as showing that the risk was one that was positively excluded.

It is not enough that the policy state that fraud or death by suicide or by legal execution will render the policy void. Avoidance is a matter of defense. But for the incontestable clause such defenses would be available to the insurer. If the risk was, as in the Lavender case, never assumed, the incontestable clause could not ·be construed as importing such additional risk into the contract. This is likewise true when suicide is expressly excluded. Hearin v. Standard Life Ins. Co. (D. C.), 8 F. (2d) 202.

There is a difference between defenses which raise an issue whether there ever was a contract, and on the other hand those which seek to avoid liability on a policy admittedly valid in its inception. Between the extremes represented by those cases where provisions for avoid-. ance are contrasted with specific exclusions from the area risks assumed, as in the Lavender case, there are cases where the language employed is susceptible of classification in either group. These cases call into play the principle requiring a construction favorable to the beneficiary. Illustration is found in Hurt v. New York Life Insurance Co., 10 Cir., 51 F. (2d) 936; Id., 10 Cir., 53 F. (2d) 453; Id., 285 U. S. 541, 52 S. Ct. 313, 76 L. Ed. 934, where the policy provided that the insurance ''shall not take effect'' unless the applicant had not consulted or been treated by a physician since her medical examination. An incontestable clause was held a bar to any attempt to establish such defense. This language goes much farther toward actual exclusion of the risk than that used in the case at bar.

Likewise, it was shown in Perilstein v. Prudential Insurance Co. of America, 345 Pa. 604, 29 A. (2d) 487, that there is a distinction between matters of defense going to the whole policy and provisions which specifically ex-

clude excepted risks (citing Williston, Contracts, Edn. 1936, Sec. 811, p. 2280). The point is clarified in Carothers v. Atlanta Life Insurance Co., 178 Tenn. 485, 159 S. W. (2d) 830, where it was held that the incontestable clause did not prevent a defense to suit based upon an excepted risk but was effective to bar a defense invoking invalidity at the inception of the policy, or where it became invalid by reason of a condition subsequently broken. Citing Metropolitan Life Insurance Co. v. Conway, 252 N. Y. 449, 169 N. E. 642.

In Sun Life Insurance Co. v. Taylor, supra, the policy provided, as here, that death in consequence of the criminal act of insured would render the policy void. Yet, an incontestable clause was effective to prevent a contest on such ground, as against the contention that it would be incontestable only as to fraud and other causes existing at the date of the contract. As said in the Lovejoy case, supra [201 Ala. 337, 78 So. 303], "It (the incontestable clause) was not an agreement to pay him, his estate, or the beneficiary, that amount if he committed suicide or was executed by virtue of the criminal law, or in any other manner contributed to his own death. The company merely agreed and bound itself that it would not litigate any of these questions, though without the incontestable clause they would be a defense. To say that the clause applies to all other defenses except suicide while sane, or death by wrongful, criminal act of the insured, is to read into the policy terms which are not there, and which the very language of the policy excludes."

So it is revealed that such provisions are not self-executing. Liability is to be avoided, if at all, by a litigated contest upon this ground. A defense based on such condition is affirmative and requires strict proof. Cooley, op. cit., supra, Vol. 6, p. 5202. We quote further from the Lovejoy case, supra: "These incontestable clauses are material and valuable provisions in contracts of life insurance. They are stressed by insurance companies as

being valuable to the insured or to the beneficiary, because affording the assurance that if the insured lives up to his contract the company will not, upon his death, contest the payment of the amount agreed to be paid, though without such provision the company would have a good defense. It would not do to treat such clauses as mere glittering generalities, inserted in the contract by the insured to induce persons to insure in the company offering same, rather than in a company not so in advance agreeing to waive all defenses, except those specified, and then allow the insurer to defend, as if it had not, for a consideration, agreed to waive its right to defend. Unquestionably, the insurance company can waive any defense after death; and we see no reason why it cannot, as a part of the contract, waive before death the right to defend''; and again later in the opinion: ''All the cases seem to hold that, where the policy provides that after a year or more the policy shall be incontestable except for certain grounds specified, and that time has elapsed, and none of the grounds excepted exists, then the policy will be given effect as it is written, and that it is incontestable on the ground of suicide or that of capital execution.'' To like effect are Supreme Conclave Improved Order of Heptasophs of Baltimore City v. Miles, 92 Md. 613, 48 A. 845, 84 Am. St. Rep. 528, 554; Goodwin v. Provident, etc., Assn., 97 Iowa 226, 66 N. W. 157, 32 L. R. A. 473, 59 Am. St. Rep. 411; Patterson v. Natural Premium Mutual Life Ins. Co., 100 Wis. 118, 75 N. W. 980, 42 L. R. A. 253, 69 Am. St. Rep., 899; Mareck v. Mutual, etc., Assn., 62 Minn. 39, 64 N. W. 68, 54 Am. St. Rep. 613; Mutual Reserve Fund, etc., Assn. v. Payne (Tex. Civ. App.), 32 S. W. 1063. Mr. Justice Holmes, in discussing the effect of the incontestable clause, said in Northwestern Mutual Life Ins. Co. v. Johnson, 254 U. S. 96, 41 S. Ct. 47, 49, 65 L. Ed. 155, 159, ''The object of the clause is plain and laudable—to create an absolute assurance of the benefit, as free as may be from any dispute of fact except the fact of death.''

So in Simpson v. Life Insurance Co. of Virginia, 115 N. C. 393, 20 S. E. 517, the Court, in upholding the definition of the word "incontestable" as one "subject to no condition whatever," stated: "The quality of incontestability could with no propriety be predicated of this contract of insurance if it was still allowed to the insurer to dispute its liability to the insured for the 'amount of the insurance' upon the ground that the death was caused 'by the use of intoxicating liquor, or by opium, or from the violation of law, or any condition or agreement contained in this policy, or the application upon which this policy is issued.' And yet, if it may now, under its contract, contest with this beneficiary as to its liability for the amount of the insurance upon the allegation that the deceased committed suicide, it may contest with beneficiaries under other similar contracts upon the grounds enumerated above. If this can be done, the policy is certainly not incontestable, for the whole field of dispute would then be open to the defendant."

In Mutual Reserve Fund Life Ass'n v. Austin, 1 Cir., 142 F. 398, 401, 6 L. R. A. (N. S.) 1064, the language used was "The term 'incontestable' is of great breadth. It is the 'policy' which is to be incontestable. We think the language broad enough to cover all grounds for contest not specifically excepted in that clause."

These views find summary support in Cooley, op. cit., supra, Vol. 5, p. 4489, where it is stated: "It is of course evident that if the insured is still living at the expiration of the period fixed by the incontestable clause, the insurer cannot thereafter dispute the policy on any ground not excepted by the clause." This distinguished authority also supports the view that the incontestable clause abrogates an exception based on a provision that the policy shall become void if the insured dies while engaged in a violation of law.

It is our conclusion, therefore, that the judgment of the trial court ought to be, and it is, affirmed.

Affirmed.

CONCURRING OPINION.

**L. A. Smith, Sr., J.**, delivered a concurring opinion.

This case has caused us much difficulty. Three of us have agreed that the appellant insurance company is not liable because of the policy of insurance and the by-laws of the fraternal order. Three of us have agreed that there is liability because of the same policy of insurance and the same by-laws of the fraternal order. This difficulty in the construction of insurance contracts is not rare or unusual, and when it occurs it is due, of course, to obscure and puzzling phraseology of such contracts. They are generally prepared by the insurer, primarily and understandably with an eye open to its own security, at least not to its own disadvantage. Upon such a situation justice requires a solution fair to both parties to the insurance contract, if it can be ascertained what justice is, in dealing with it.

Sometime, as here, the discovery of its meaning, in the light of the words used, is a most arduous task. Ordinary experience, as well as judicial history, both attest this obvious fact. Here, we are equally divided in our interpretation of certain provisions of the insurance contract. Under such circumstances, I think it is reasonable to say that it is logically susceptible of two maintainable constructions—one favorable to liability of appellant and the right of the beneficiary to recover; the other favorable to nonliability of the appellant and the lack of the right to recover by appellee. Since the appellant insurer, in drafting the policy originally, had it within its power to word it in plain and unambiguous terms, and did not do so, it, and not the beneficiary of the assured, should suffer the result of such obscurity. The primary purpose of the policy—payment of its amount upon assured's death—should supervene and dominate doubtful avoidance of that purpose by language without lucidity or clearness of meaning. So, here, I think the principle of jurisprudence

declaring that rule should be applied. Such a course is fairer to insurer than its action in obscuring meaning in vague verbiage is to the beneficiary of its assured, who faithfully paid premiums to it over a long period of years.

There is ample justification for this view in the authorities, and in reason, I think. Let it be understood that I am not unmindful of the rule of construction of insurance contracts; that they are to be construed like any other contract between parties, where the terms are plain and unambiguous; but where they are doubtful and ambiguous, the contract is to be interpreted most favorably to the insured and against the insurer. Such is the announced rule in the state. Georgia Casualty Co. v. Cotton Mills Products Co., 159 Miss. 396, 132 So. 73. The general rule is announced in 44 C. J. S., Insurance, section 297, p. 1166. It is there said: "A policy or contract of insurance ordinarily is to be construed liberally in favor of the insured and strictly as against the insurer; or, as more fully stated, if the language employed is ambiguous, or there is doubt or uncertainty as to its meaning and it is fairly susceptible of two interpretations, one favorable to the insured and the other favorable to the insurer, the former will be adopted." This is the general rule, although it is not the universal rule, there being a small minority of states which do not accept it.

It is further announced in the same treatise that where there is doubt or uncertainty as to the meaning and it is fairly susceptible of two interpretations, one favorable to the insured or his beneficiary and the other favorable to the company, "the former will be adopted, even though it was the intention of insurer that the policy, or a particular clause or provision thereof, should have a different meaning." The reason for the rule is given as "that insured usually has no voice in the selection or arrangement of the words employed and that the language of the contract is selected with great care and deliberation by experts and legal advisers employed by, and acting exclusively in the interest of, the insurance com-

pany, which therefore, is at fault for any ambiguity or uncertainty therein. . . . "

It is contended here by appellant that the insurer never assumed the risk of execution of the insured in consequence of his violation of law. This, it seems, would base the position of appellant upon an exception to the promise by the insurer to pay the amount of the policy upon the death of the insured. But here, with particular emphasis, ambiguity beclouds the meaning of the contract. The rule applies to conditions or other provisions employed for the purpose of creating exceptions to, or limitations on, the liability of the company. There are numerous authorities cited by Corpus Juris Secundum to sustain this announcement, 44 C. J. S., Insurance, section 297, p. 1181. The rule applies to contracts of life insurance, section 297, p. 1187, and ambiguous provisions in constitutions, by-laws, or rules of the company, section 297, p. 1183.

Admitting freely, as I do, the persuasive power of the dissenting views here, and even conceding that such views are supported by sound reasoning, yet, on the other hand, I respectfully contend that the controlling opinion is supported by persuasive power and sound reasoning, too. It must therefore follow, I think, upon the application of the general rule quoted, that of the diverse interpretations in the instant case, that one favorable to the insured must prevail, and the appellee recover because of the argument of the controlling opinion and the consonance with the conclusion therein reached by the views of Judge ROBERDS concurring. I, therefore, concur in the conclusions reached by the controlling and said concurring opinions, as well as in the reasoning on which they are respectively based, and that the judgment of the trial court should be affirmed.

774

**Roberds, J.,** delivered a specially concurring opinion.

I concur in the opinion that the insurer cannot contest the policy under the circumstances here, especially since the right attempted to be asserted is not that of alone contesting liability for death of the insured but is also to cancel and annul the policy for all purposes, the insurer retaining all premiums which have been paid during the life of the policy, twenty-one years.

However, I am also of the opinion that death by execution was not included within the provision. ". . . If his death shall occur in consequence of any violation or attempted violation of law . . . ," and that it was not so intended.

As to the result of actual violation of the law, death by execution could have resulted in only three cases, i.e., murder, rape and treason, and under these charges conviction and penalty of death are rather remote. A small pecentage of those so charged are convicted and sentenced to death. Except in those three cases the death resulting from law violations could only be natural death in consequence of natural injuries received during such violations. So that comparing the number of death sentences with the number who are convicted and who are not sentenced to death under the three named charges, and also comparing such number of death sentences with the myriad of cases where death results from law violations where there is no legal punishment by death, the ratio of legal deaths to natural deaths from actual and attempted law violations would perhaps be no greater than one to four or five hundred.

Again, it will be noted that the words "in consequence" precede not only actual violation of law but also "attempted violation of law." The words "in consequence" appear only once and apply alike to both actual and attempted violations. Now, there is no such thing as legal

death penalty for attempted violation of law. It cannot be claimed that legal death was included within attempted violations of law, for such a thing could not happen.

Furthermore, the provisions apply to persons who die from violations or attempted violations of law "whether sane or insane." Now, if the accused is insane death by execution cannot properly and legally result from his act, so that, as applied to insane persons, the provision could not include death by execution. Therefore, if they are construed to include legal death, they will be given a meaning in those few cases which cannot be given them in all of the other cases.

It is noted also that if death by execution is included, then the insurer may later be relieved entirely of liability by act of the Legislature regardless of the protest of the insured and of the original rights of the parties. For instance, robbery with fire arms was not punishable by death when this contract was made, but is now.

While the case of Baker v. Supreme Lodge, Knights of Pythias, 103 Miss. 374, 60 So. 333, 334, Ann. Cas. 1915B, 547 did not construe the words "in consequence," it did say that "In order that the death of an insured may be said to have been caused or superinduced in the violation or attempted violation of a criminal law within the meaning of this clause of an insurance policy, it must appear that his act bore such relation to his death that the latter would not have occurred at the time and place, if the assured had not been engaged in violating the law," thereby confining the resulting death to causes occurring during the law violation. It will be noted, too, in the case at bar the provision does not limit the causes to violation of criminal law as in the Baker case, but includes all law violation, criminal and civil. Whether or not it is possible for one to suffer death in consequence of a violation of the civil law, under conceivable circumstances, the contention of the insurer that "in consequence," as here used, includes legal execution would certainly have been much stronger had the term criminal law been

used, as the better showing that such death was in the mind of the drafter of this provision.

Many insurance policies expressly include legal death, as in the Baker case, supra. The Company drafted this policy as well as the by-laws. They were drafted, of course, mainly for the protection and benefit of the insurer. It knew that many life insurance policies expressly include legal death. It could easily have so expressly provided in the policy and by-laws. It is noted that since the issuance of this certificate in 1925 it has assumed to change the policy provisions by adopting new by-laws. For instance, in the original certificate the cases of personal altercation, violation or attempted violation of law, were all in one and the same cause, and all were preceded by the words "in consequence." Since then new by-laws have prescribed different words defining the circumstances of death from acts of the insured other than law violation or attempted violation. However, the original word "consequence," as applying to such violations, has not been changed, or attempted to be changed. There are cases holding both ways on the proposition under consideration. The insurer herein, being in the life insurance business, naturally knew that many policies, in order to free the question from doubt, contain provisions expressly including legal death, and it also knew that the courts have differed as to the construction of the provision as written in this policy. In other words, the insurer has known all along that the meaning of this provision has been and is doubtful, and the courts have so held. In such case the doubt should be construed against the insurer.

### DISSENTING OPINION.

**Griffith, J.,** delivered a dissenting opinion.

The controlling opinion does not assert that the execution was not "in consequence of a violation of law."

It requires no legal learning to answer that question. If the average citizen knowing the facts were asked why was the insured executed, he would reply at once that it was because he had violated the law in the commission of a capital offense—had committed murder. The question in the case, then, is whether liability for death, which results as a consequence of violation of the law, was ever assumed by the policy.

In Sanders v. Jefferson Standard Life Ins. Co., 5 Cir., 10 F. (2d) 143, the language of the policy was to except from the policy any liability for death occurring in a certain way. In Head v. New York Life Ins. Co., 10 Cir., 43 F. (2d) 517, which relied, among others, on the Sanders case, the language was that the insurance shall not be payable if the death occurred in a certain way. In our own case, Lavender v. Volunteer State Life Ins. Co., 171 Miss. 169, 157 So. 101, which expressly approved the holding in the Sanders case, the language was that it would not cover a death occurring in a certain way, and these cases held that inasmuch as the loss in such case was not assumed by the policy, the incontestable clause did not apply—the Lavender case summarizing the matter on page 182 of 171 Miss., on page 104 of 157 So., in this statement: "It cannot properly be said that a party to an instrument contests it by raising the question whether under its terms a liability asserted by another party has or has not accrued." See to the same effect Williston on Contracts, Sec. 811.

In the case at bar the language is that the policy shall be void and of no effect as to a death occurring in a certain way. To say that the policy shall be of no effect as to a death occurring in a certain way is precisely the same as to say that it does not cover a death occurring in that way, and is precisely the same as to say that it excepts a death occurring in that way; and is precisely the same as to say that the insurance shall not be payable if the death occurs in a certain way, and would be so understood by the average person; and policies of insurance

mean what would be so understood,—highly technical or ingeniously refined constructions should not be placed upon them, as has been done 'here. See the numerous cases from every state cited in 44 C. J. S., Insurance, section 294, pp. 1155 to 1159. We ought to follow the Lavender case instead of frittering it away by subleties too refined for any use in the practical affairs of life, making distinctions without difference, which, if allowed, no case in our books would ever be worth anything.

**McGehee, J.,** and **Sydney Smith, C. J.,** concur in this dissent.